Rose FINSKY et al.,[1] Plaintiffs-Appellants,

v.

**UNION CARBIDE & CARBON CORP., a New York corporation, owners and operators of a division thereof known as Haynes Stellite Co., Defendant-Appellee.**

No. 12053.

United States Court of Appeals Seventh Circuit.

Nov. 21, 1957.

As Amended Dec. 19, 1957.

Rehearing Denied Dec. 26, 1957.

1. Avrum Andalman, Joseph M. Andalman, Lee B. Andalman, Yetta S. Andalman and Maxwell N. Andalman, co-partners, doing business under the name of Surplex Sales.

**450**

Elmer Gertz, Irwin S. Baskes, Chicago, Ill., for plaintiffs-appellants.

Robert Tieken, U. S. Atty., Edwin A. Strugala, Asst. U. S. Atty., Chicago, Ill., Richard C. Bleloch, John Peter Lulinski, Chicago, Ill., Asst. U. S. Attys., of counsel, for appellee.

Before DUFFY, Chief Judge, SCHNACKENBERG and HASTINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Plaintiffs appeal from a summary judgment in favor of defendant, entered on defendant's motion, which judgment also denied plaintiffs' motion for summary judgment.

Plaintiffs filed a complaint in what they state is an action for damages for breach of a contract of sale, involving certain tungsten powder [2] and other materials.

Defendant's answer to the complaint, as later amended,[3] set up, among affirmative defenses, that title to the tungsten was in the federal government, and any prospective sale of the said tungsten was subject to the applicable United States statutes and regulations, and that plaintiffs at no time ever acquired a valid title or claim to the said tungsten.

The case was submitted on the motions for summary judgment and the pleadings, requests for admissions, responses to requests for admissions, affidavits, depositions and exhibits in support thereof. Therefrom appear the following relevant facts:

Defendant's Haynes Stellite division [4] entered into Department of Defense contracts for production of an item for Army Ordnance. To perform these contracts, defendant bought about 972,000 lbs. of tungsten, all but 173,205 lbs. of which was used in the production for Army Ordnance.

A certain provision contained in each of these contracts is, in part:

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, * * * theretofore acquired or produced by the Contractor for the performance of this contract, * * * shall forthwith vest in the Government; * * *."

Another provision contained in each of these contracts provided for termination of the contract for the convenience of the government upon notice to the contractor. Also provided therein was the obligation of the contractor to use its best efforts to sell, in the manner, at the time, to the extent, and at the price or prices directed or authorized by the government

2. Hereinafter sometimes called "tungsten".

3. Count I alleges a breach of contract and seeks damages, Count II asks for a declaratory judgment and specific performance, Count III prays for a declaratory judgment and damages, and Count IV asks for money had and received and

seeks recovery of $1,054,745.39 allegedly paid defendant by United States (hereinafter referred to as "the government") for tungsten to which plaintiffs claim they are entitled, plus interest.

4. Sometimes referred to herein as "Haynes Stellite".

contracting officer, all such material produced as a part of, or acquired in connection with the performance of the work terminated by the notice.

Specifically there were the following provisions:

"* * * Provided, that after receipt of notice of termination, any such property that is a part of termination inventory may be acquired or disposed of only in accordance with the provisions of the clause of this contract entitled Termination for Convenience of Government and applicable laws and regulations. * * * "

and

"(b) After receipt of a Notice of Termination, and except as otherwise directed by the Contracting Officer, the Contractor shall * * * (6) transfer title and deliver to the Government, * * * (i) * * * material produced as a part of, or acquired in connection with the performance of the work terminated by the Notice of Termination, * * ."

Prior to March 9, 1953, the government made partial payments, under these contracts, of over $3,000,000. All of the tungsten acquired thereunder ~~as physically segregated. The tungsten under the said government contracts was also segregated in its use and in records in regard thereto.

Prior to completion of these contracts, the government contracting officer, Henry C. Laskin, served upon defendant notice that the government, effective March 11, 1953, terminated these contracts for its convenience. Thereafter, Laskin directed defendant to dispose of all materials acquired by defendant under these contracts, including the 173,000 pounds of tungsten, to advertise for and solicit bids for the sale thereof, and to sell, to the high bidder, with the approval of the United States government, all such materials.

Early in February 1954 defendant advertised three times in the Waste Trade Journal, soliciting bids for the 173,000-odd pounds of tungsten, among other items. This advertisement appeared under a bold face caption reading "Government Contract Cancellation." The advertisement further stated, "The Government reserves the right to reject any and all bids. Terms Cash, F.O.B. Kokomo plant." Plaintiffs saw this advertisement.

February 11, 1954, Haynes Stellite wrote a letter to Surplex Sales inviting bids on all the materials listed in the advertisement. This letter in part provided, "Terms of payment will be our option. (Cashier's check, certified check, or sight draft)."

February 23, 1954, plaintiffs submitted their bid on the tungsten, among other items, expressly pursuant to the advertisement and the letter. This bid, in part, stated, "Terms of payment per your letter at your option."

Haynes Stellite advised plaintiffs that Surplex Sales was high bidder on the tungsten "and that report would be made to the government and the plaintiffs would be notified orally and in writing if their bids were approved by the United States Government."

March 4, 1954, plaintiff Joseph Andalman telephoned New York Ordnance where the bid was subject to approval. He called again on March 5, 1954 and was told that plaintiffs' bid was approved. He and plaintiff Maxwell Andalman the next day went to Kokomo, Indiana, where the tungsten was stored, and met with the Haynes Stellite office manager. Here they gave him a check for one barrel of the tungsten, and commented that they needed it for use as sales samples. At the same time the office manager handed them a letter stating that they had been awarded the tungsten in accordance with their February 23 bid. Plaintiffs later received written notification from New York Ordnance confirming acceptance. Laskin and the Army Board of Awards approved the bid without submitting or offering the tungsten to the General Services Administration, which gave no release or authorization for the sale.

March 10, 1954, New York Ordnance wired Haynes Stellite, in substance, that the sale of tungsten to Surplex Sales was "suspended," and that "no deliveries are to be made whatsoever pending further instructions." Defendant notified plaintiffs thereof the same day.

By letter dated March 17, 1954, Laskin directed defendant to turn over to the government, in accordance with forthcoming shipping instructions, the tungsten in question, giving as a reason that General Services Administration had not approved the disposition of the property to plaintiffs, that it was being stock-piled by the government and the interests of national defense required that it be delivered to the government and the aforesaid approved disposition (to plaintiffs) canceled or rescinded. The material was thereupon delivered to the government.

Defendant, which in this litigation is represented by government attorneys, argues that the parties in this case are presumed to have assented to applicable federal law existing at the time they entered into their contract, which prohibited the sale of the tungsten powder and directed it to be stockpiled as material strategic and critical to the national defense and that defendant's performance of the contract with plaintiffs was therefore excused.

To meet this argument, plaintiffs say that defendant is attempting to go behind the sale to show what the government did and did not do prior to refusing to take possession and title and ordering the property sold, defenses which (they say) actually have no place in this case and require no reply by them. Be that as it may, plaintiffs argue that these defenses are overcome by the law. They contend that a federal act (40 U.S.C.A. § 484 et seq.) basically underlies the sale

of government surplus and contract termination inventory and that § 484(d) thereof made the routine acceptance and approval of plaintiffs' bid, on which the written award in this case was based, conclusive evidence of compliance with the law insofar as it concerns their title as purchasers. Plaintiffs further contend that the army could have taken possession, if it saw fit to do so, when it terminated the "classified" contract with defendant. The contract gave the government that right and option, but not having exercised such right and option, the material became exempt and saleable free of governmental interest.

We shall now consider all acts of congress and all directives, orders and regulations, bearing upon the respective contentions of the parties. We shall quote only relevant parts thereof.

By 40 U.S.C.A. ch. 10, § 471 et seq., Management and Disposal of Government Property,[5] provision is made, *inter alia,* for the disposal of government surplus property.

Definitions in § 472 include:

"(a) The term 'executive agency' means any executive department or independent establishment in the executive branch of the Government, * * *.

"(c) The term 'Administrator' means the Administrator of General Services [6] * * *.

"(e) The term 'excess property' means any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof. * * *

"(g) The term 'surplus property' means any excess property not re-

---

5. Which we shall sometimes refer to as "Government Property act."

6. The General Services Administration was established June 30, 1949 by act of Congress, 5 U.S.C.A. § 630, which reads, in part:
   "General Services Administration—Establishment (a) There is established an

agency in the executive branch of the Government which shall be known as the General Services Administration.
   "Administrator of General Services; appointment (b) There shall be at the head of the General Services Administration an Administrator of General Services * * *."

quired for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator. * * *

"(k) The term 'contractor inventory means (1) * * * and (2) any property which the Government is obligated to take over under any type of contract as a result * * * of the termination of such contract * * * prior to completion of the work, for the convenience or at the option of the Government."

Section 483 reads, in part:

"Property utilization—(a) Policies and methods

"In order to minimize expenditures for property, the Administrator shall prescribe policies and methods to promote the maximum utilization of excess property by executive agencies, and he shall provide for the transfer of excess property among Federal agencies.

"Duties of executive agencies

"(b) Each executive agency shall * * * (2) continuously survey property under its control to determine which is excess property, and promptly report such property to the Administrator, (3) perform the care and handling of such excess property, and (4) transfer or dispose of such property as promptly as possible in accordance with authority delegated and regulations prescribed by the Administrator. * * *

"Transfers between departments of Department of Defense

"(d) * * * excess property of one of the departments of the Department of Defense may be transferred to another department thereof.

"Transfer of excess property

"(e) Transfers of excess property between Federal agencies * * * shall be at the fair value

thereof, as determined by, or pursuant to regulations of, the Administrator * * *."[7]

Section 484 provides:

"Disposal of surplus property— (a) Supervision and direction

"Except as otherwise provided in this section, the Administrator shall have supervision and direction over the disposition of surplus property. * * *

"Care and handling

"(b) The care and handling of surplus property, pending its disposition, and the disposal of surplus property, may be performed by the General Services Administration or, when so determined by the Administrator, by the executive agency in possession thereof or by any other executive agency consenting thereto.

"Method of disposition

"(c) Any executive agency designated or authorized by the Administrator to dispose of surplus property may do so by sale, exchange, lease, permit, or transfer, for cash, credit, or other property, with or without warranty, and upon such other terms and conditions as the Administrator deems proper, and it may execute such documents for the transfer of title or other interest in property and take such other action as it deems necessary or proper to dispose of such property under the provisions of this title.

"Validity of deed, bill of sale, lease, etc.

"(d) A deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency purporting to transfer title or any other interest in surplus property under this subchapter shall be conclusive evidence of compliance with the provisions of this subchapter insofar as concerns title or other

---

**7.** While the tungsten became excess property on March 11, 1953, no one contends that it was thereafter transferred be- tween departments of the Department of Defense, or between federal agencies as was permissible under § 483(d) and (e).

interest of any bona fide grantee or transferee for value and without notice of lack of such compliance.

\* \* \* \* \* \*

"Contractor inventories

"(f) Subject to regulations of the Administrator, any executive agency may authorize any contractor with such agency or subcontractor thereunder to retain or dispose of any contractor inventory. \* \* \*."

Section 486 reads as follows:

"Policies, regulations, and delegations—(a) Promulgation by President

"The President may prescribe such policies and directives,[8] not inconsistent with the provisions of this chapter, chapter 11B of Title 5, chapter 4 of Title 41, and chapter 11 of Title 44, as he shall deem necessary to effectuate the provisions of said chapters, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder.

\* \* \* \* \* \*

"Regulations by Administrator

"(c) The Administrator shall prescribe such regulations as he deems necessary to effectuate his functions under this chapter, chapter 11B of Title 5, chapter 4 of Title 41, and chapter 11 of Title 44, and the head of each executive agency shall cause to be issued such orders and directives as such head deems necessary to carry out such regulations. \* \* \*." Section 487(a) reads thus:

"Surveys of Government property and property management practices; utilization of uniform catalog system and standardized purchase specifications; audit

"(a) \* \* \* the Administrator is authorized (1) to make surveys of Government property and property management practices and obtain reports thereon from executive agencies; (2) to cooperate with executive agencies in the establishment of reasonable inventory levels for property stocked by them and from time to time report any excessive stocking to the Congress and to the Director of the Bureau of the Budget; \* \* \*."

By section 492 of the Administrator is required to make reports to Congress.

What is known as the "Strategic and Critical Materials Stockpiling Act", 50 U.S.C.A. § 98 et seq.[9] contains, *inter alia*, the following provisions:

"Declaration of policy

"The natural resources of the United States in certain strategic and critical materials being deficient or insufficiently developed to supply the industrial, military, and naval needs of the country for common defense, it is the policy of the Congress and the purpose and intent of sections 98–98h of this title to provide for the acquisition and retention of stocks of these materials and to encourage the conservation and development of sources of these materials within the United States, and thereby decrease and prevent wherever possible a dangerous and costly dependence of the United

---

8. The President directed the Administrator of General Services to make a study and a determination of the centralization in General Services Administration to be attained in the performance of the functions involved in the June 30, 1949 Federal Property act, and he directed that thereupon "the Administrator shall prescribe such regulations as may be necessary to implement the determination resulting from such studies and surveys."

The President further directed that the various executive agencies "shall, insofar as practicable, procure, utilize and dispose of property in accordance with the provisions of the Act [said chapters] and the regulations issued thereunder in order that the greatest overall efficiency and economy may be effected."

9. Which we shall sometimes refer to as "Strategic Materials act".

States upon foreign nations for supplies of these materials in times of national emergency."

Section 98a, as amended July 26, 1947,[10] provides in part:

"Strategic and critical materials; determination; quantity and quality to be purchased; formation and functions of industry advisory committees; subsistence and traveling expenses of members

"(a) To effectuate the policy set forth in section 98 of this title the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Interior, acting jointly through the agency of the Army and Navy Munitions Board, are [11] authorized and directed to determine, from time to time, which materials are strategic and critical under the provisions of sections 98–98h of this title and to determine, from time to time the quality and quantities of such materials which shall be stockpiled under the provisions of said sections. * * *"

Section 98b reads, in part:

"Purchase, storage, refinement, rotation, and disposal of materials

"The Secretary of the Army and the Secretary of the Navy [11] shall direct the Administrator of General Services to—* * * (e) dispose of any materials held pursuant to sections 98–98h of this title which are no longer needed because of any revised determination made pursuant to section 98a of this title, as hereinafter provided. * * * *Provided,* That no material constituting a part of the stock piles may be disposed of without the express approval of the

Congress except where the revised determination is by reason of obsolescence of that material for use in time of war. * * *."

Section 98e reads in part as follows:

"Transfer of surplus materials to stock piles; exceptions; * * *

"(a) Pursuant to regulations issued by the General Services Administration, every material determined to be strategic and critical pursuant to section 98a of this title, which is owned or contracted for by the United States or any agency thereof, * * * shall be transferred by the owning agency, * * * to the stock piles established pursuant to sections 98–98h of this title, * * *. There shall also be exempt from this requirement (1) any material which constitutes contractor inventory if the owning agency shall not have taken possession of such inventory, * * *."

General Services Administration by Emergency Procurement Regulation No. 1, dated August 14, 1951, and Supplements No. 1 and No. 2,[12] all of which were in effect during the year 1954, provided, in part:

"1. *Purpose.* This Regulation prescribes the policy and general methods for the transfer of excess strategic and critical materials to the stock pile. It is issued pursuant to the provisions of the Strategic and Critical Materials Stock Piling Act (60 Stat. 596; 50 U.S.C. 98–98h), and the Federal Property and Administrative Services Act of 1949, as amended (Public Laws 152 and 754, 81st Congress),[13] and in coop-

---

10. See Ch. 343, Title II, § 213, 61 Stat. 505, now 10 U.S.C.A. § 2201.

11. All functions under section 98 et seq. of this title vested in the Secretaries of the Army, Navy, Air Force, and Interior or in any of them or in any combination of them, including the fuctions vested in the Army and Navy Munitions Board by section 98e(a)(2) of this title, but excluding the functions vested in the Secre-

tary of the Interior by section 98f of this title, were transferred to the Director of the Office of Defense Mobilization by 1953 Reorg. Plan No. 3 § 2(b), eff. June 12, 1953, 18 F.R. 3375, 67 Stat. 634, 5 U.S.C.A. note following section 133z–15.

12. As a group hereinafter referred to as regulation No. 1.

13. 40 U.S.C.A. § 471 et seq.

eration with the Munitions Board of the Department of Defense."

"2. *Definitions.*

\* \* \*

· "b. 'Contractor inventory' means (1) \* \* \* and (2) any property which the Government is obligated or has the option to take over under any type of contract as a result \* \* \* of the termination of such contract \* \* ·\* prior to completion of the work, for the convenience or at the option of the Government.

"c. 'Excess,' with respect to strategic materials, means any such property under the control of any agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof.

"d. 'Holding agency' means any agency having accountability for strategic materials.

"e. 'Strategic materials' means material determined to be strategic and critical by the Munitions Board pursuant to the Strategic and Critical Materials Stock Piling Act, a list of such materials being appended hereto as Appendix A."

"3. \* \* \*

"c. *Form of Reports.* Holding agencies shall file reports of excess strategic materials with the Administration \* \* \*.

"d. *Contractor Inventory.* Each agency having strategic materials in contractor inventory which are determined to be excess to the needs of the agency, shall report such materials in the manner prescribed by this Regulation. \* \* \* When after reporting such property, the strategic materials are determined suitable for stock piling, the con-

tracting agency shall take the necessary action to acquire title for the Government and shall transfer such property to the General Services Administration for stock piling, in accordance with Section 4 of this Regulation."

"4. *Transfers to the Stock Pile.*

"a. *General.* Excess strategic materials reported to the Administration, which are determined by the Administration to be suitable for stock piling, shall be transferred to the General Services Administration for stock piling in accordance with this Regulation.

"b. *Unsuitable Items.* Excess strategic materials reported to the Administration which are determined by the Administration to be unsuitable for stock piling or which cannot economically be converted to meet stock pile requirements shall, after notification of such determination, be reported and disposed of in accordance with the provisions of General Services Administration Personal Property Management Regulation No. 3, Revised.

\* \* \*

"Appendix A
List of Strategic and Critical Materials
\* \* \*

"Tungsten   Ores, concentrates, ferro, powder
metal, oxide.   10,000 pounds"

■ Congress has placed upon the General Services Administration a function, which has two prongs, one derived from the Government Property Act and the other from the Strategic Materials Act. The former serves the principal purpose of efficiency and economy; [14] the latter, the common defense.[15] Each is

14. 40 U.S.C.A. § 471:
"It is the intent of the Congress in enacting this legislation to provide for the Government an economical and efficient system for \* \* \*. (b) the utilization of available property; (c) the disposal of surplus property; \* \* \*."

15. 50 U.S.C.A. § 98:
"The natural resources of the United States in certain strategic and critical materials being deficient or insufficiently developed to supply the industrial, military, and naval needs of the country for common defense, it is the policy of Con-

complete and independent of the other. The existence of this responsibility being embedded in statutory law, all persons are bound to recognize the function of the General Services Administration when dealing in the respective areas covered by those two acts of Congress.[16] Where the approval of that administration is required, no error, oversight or mistake by anyone can excuse an omission to obtain it. Without its approval of the disposition of government property subject to said statutes, a red light is set preventing a consummation of any such transaction. Only by the procurement of such approval can such a transaction, if otherwise lawful, proceed on a green light to consummation.

### The Government Property Act.

■ The legislative history makes it clear that it was the congressional intent, in enacting the Government Property Act, to deal with the most important phase of property management, which is continuing use by the government of the government's property, and the disposal of its surplus property. See House Committee Report, 2 U.S.Code Congressional Service (1949), pp. 1475, 1476, 1478, 1487 and 1488.

The act places upon the Administrator a duty to determine what excess property shall constitute surplus property, § 472(g), and a duty to provide for the transfer of excess property among federal agencies, § 483(a). The act requires prompt reports of excess property by each executive agency to the Administrator and the transfer or disposal thereof in accordance with authority delegated and regulations prescribed by the Administrator, § 483(b).

A general power of supervision and direction over the disposition of surplus property is vested in the Administrator, § 484(a). In fact, the disposal of surplus property may be performed by the Administrator, or, when so determined by him, by the executive agencies in possession thereof or by any other executive agency consenting thereto, § 484(b).

By § 484(c) any executive agency designated by the Administrator may dispose of surplus property upon such terms and conditions as the Administrator deems proper.

Subject to the Administrator's regulations, any executive agency may authorize any contractor with it to retain or dispose of any contractor inventory, § 484(f).

Section 486(c) empowers the Administrator to prescribe regulations to effectuate his functions, and directs the head of each executive agency to issue orders to carry out such regulations. In addition, § 487(a) authorizes the Administrator to report any excessive stocking of property to the Congress and the Director of the Bureau of the Budget.

In this court, the keystone in plaintiffs' case is § 484(d), which reads:

"A deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency purporting to transfer title or any other interest in *surplus* property under this subchapter shall be conclusive evidence of compliance with the provisions of this subchapter insofar as concerns title or other interest of any bona fide grantee or transferee for value and without notice of lack of such compliance." (Emphasis supplied.)

■ When the army's New York Ordnance suspended the sale to plaintiffs, one barrel of tungsten had been delivered to them, for which they paid cash. They

---

gress * * * to provide for the acquisition and retention of stocks of these materials * * *."

**16.** United States v. Jones, 9 Cir., 176 F.2d 278, is heavily relied upon by plaintiffs. It is significant that in that case the court, at page 281, said:
"* * * * a public officer, in exercising powers conferred upon him by statute

and regulation, is bound to follow the mode or manner prescribed. One who deals with such official is on his notice of possible limitations of authority. And no estoppel can arise against the Government from the performance of unauthorized acts or from authority exercised in a manner forbidden." (Citing cases.)

never paid or tendered any part of the purchase price on the balance of tungsten which they had agreed to buy. The circumstances under which they made their bid show that they knew they were dealing with material subject to government contract cancellation, and that the terms of their bid were cash, f. o. b. defendant's plant. They were specifically informed in Haynes Stellite's letter soliciting bids that the terms of payment would, at the option of Haynes Stellite, be cashier's check, certified check or sight draft (which is equivalent to cash). Their bid expressly accepted these terms of payment.

Burns' Indiana Statutes (1951), § 58–202 (relied upon by plaintiffs), is as follows:

"Property in specific goods passes when parties so intend.—(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

The circumstances above set forth indicate that the parties to the contract intended that the title to the tungsten would be transferred to plaintiffs at Kokomo, Indiana, when they paid for it. Therefore, when Laskin called the attention of defendant to the fact that General Services Administration had not approved the disposition of the property to plaintiffs, which fact required that the sale to plaintiffs be canceled, the contract between defendant and plaintiffs was still unconsummated and no title had passed, except as to one barrel of tungsten. Inasmuch as, prior to the government's intervention, the time had not arrived when the parties to the contract intended the property in the remaining tungsten to be transferred to plaintiffs and there never was any instrument executed purporting to transfer the title,

§ 484(d) does not sustain plaintiffs' position.

It will be noted that § 484(d) of the Government Property Act, upon which plaintiffs rely, limits its application to *surplus property* under *that* act. Having thus taken the position that they are buying surplus property, plaintiffs are unable to point to any action by the Administrator directing or supervising the sale of the tungsten to them, as required by § 484(a), nor can they show that this surplus property was disposed of by the Administrator or by an executive agency which the Administrator determined should so dispose of it, as provided in § 484(b). Moreover, inasmuch as § 484(f) deals with the disposal of property constituting a part of a contractor inventory, plaintiffs point to no regulation of the Administrator under which the sale herein relied upon by plaintiffs was made.

The tungsten in this case was contractor inventory. By virtue of the partial payments clause of the contracts between the government and defendant, title to it was in the government. Even if title was not in the government, under termination clauses of the contracts the government had an option to take title, so that the tungsten was nevertheless "contractor inventory", and was subject to stock piling.

The contract was unenforcible, for want of compliance with the Government Property Act. What we have said requires affirmance of the judgment of the district court.

Because the facts in United States v. Jones, 9 Cir., 176 F.2d 278, relied upon by plaintiffs, are fundamentally different from those in the case at bar, that case, with its able opinion, is not persuasive here. Among the differences in facts are the following:

(1) In the Jones case the government relied on an error made by its employees which led to the consummation of a sale of surplus property. There was no assertion of lack of authority to make the sale (p. 283) as there was here; (2) after agree-

ing to buy the material, Jones paid for all of it and sales memoranda were issued to him accordingly; (3) a receipt for his payment as well as bills of sale (form W.A.A.—1(a)) were mailed to Jones.

All of the items sold except a lot of universal gear joints, were delivered to Jones but the government refused to deliver the latter joints. Instead it sued to rescind the sale. The court recognized that in the Jones case "there were proper instruments acknowledging transfer of title to the purchaser". Of course the court held, at page 289, that, in view of § 25 of the Surplus Property act of 1944, 58 Stat. 780 (which is relevantly the same as § 484(d) of the General Property Act, here relied on by plaintiffs):

"* * * the very parties with whom the agencies dealt and to whom the instruments were made out, should be protected if they paid value. No other condition was attached.

"Jones is in this class. He paid value, the price asked. * * *"

### The Strategic Materials Act

Equally fatal to plaintiffs' action is the Strategic Materials Act, 50 U.S.C.A. § 98 et seq. Enacted to further the common defense of the country, this act provides for the acquisition and retention of stocks of strategic and critical materials in order to supply the industrial, military and naval needs of the country. It authorizes the Director of the Office of Defense Mobilization to determine what materials are strategic and critical. This act provides that, pursuant to regulations issued by the General Services Administration, material owned or contracted for by the United States or any agency thereof, when determined by such agency to be surplus, shall be transferred to stock piles, provided that any material in contractor inventory is to be exempt from stock piling if the owning agency shall not have taken possession of such inventory. §§ 98a, 98b, and 98e(a).

■ Plaintiffs argue that, because regulation No. 1 was not published and because they did not learn of it, their purchase from defendant is not subject to the act itself. It is not denied by plaintiffs that regulation No. 1 was adopted. They say that it was not published. They cite no authority requiring publication. They do not charge that knowledge of the adoption of the regulation or its contents was kept from them by any act or conduct of General Services Administration or any other governmental body or officer. This regulation, in part, listed tungsten as a strategic and critical material. This listing had the effect of applying the Strategic Materials Act to the tungsten later bought by plaintiffs.

We hold that, on the facts in this case and the applicable provisions of the Strategic Materials Act and regulation No. 1, the tungsten here involved was stock-piled as a strategic and critical material and therefore the sale of it to plaintiffs was and is invalid.

■ By reply brief plaintiffs for the first time made the contention that there is no evidence in the record that the "Munitions Board [sic]" ever determined that tungsten was critical and in what quantities it deemed it critical. They say, in effect, that General Services Administration's so listing it, does not make it so. This matter was not discussed in either plaintiffs' main brief or the defendant's brief herein, and, as pointed out by defendant in oral argument, the introduction of this matter belatedly in the reply brief is in violation of rule 17 (e) of this court, 28 U.S.C.A. We do not, therefore, express any opinion as to that contention.

### Conclusion as to Validity of Contract

The approval of General Services Administration is an integral part of the authority essential to the creation of the alleged contract upon which plaintiffs sued. Without that approval the contract does not exist any more than a three-legged stool can stand when it is built with one leg missing. We hold

that, under federal law, the contract between plaintiffs and defendant was unauthorized and, therefore, was and is unenforcible.

Plaintiffs urge that the facts in this case show that their property was taken for public use without due process or just compensation, relying upon amendments V and XIV of the constitution of the United States. We do not agree with this contention.

For the reasons hereinbefore set forth, the judgment of the district court is affirmed.

Affirmed.