Peter J. BRENNAN, Secretary of Labor,
Petitioner,

v.

GILLES & COTTING, INC., and Occupational Safety and Health Review
Commission, Respondents.

No. 73–2471.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1974.

Decided Oct. 18, 1974.

Barbara L. Herwig, Atty., U. S. Dept. of Justice (Irving Jaffe, Acting Asst. Atty. Gen., Carla A. Hills, Asst. Atty. Gen., Stephen F. Eilperin, Atty., U. S. Dept. of Justice, on brief), for petitioner.

Robert C. Adams, Fairfax, Va. (Kennon W. Bryan, Fairfax, Va., on brief), for respondent Gilles and Cotting, Inc.

Allen H. Sachsel, Washington, D. C., Appellate Counsel, for respondent Occupational Safety and Health Review Commission.

Before BRYAN, Senior Circuit Judge, and WINTER and FIELD, Circuit Judges.

WINTER, Circuit Judge:

Following the collapse of a scaffolding which caused the death of two workers on the payroll of Southern Plate Glass

Company (Southern), a subcontractor of Gilles & Cotting, Inc. (Gilles), the Secretary of Labor issued citations against Southern and Gilles for "serious violations" [1] of the safety regulations governing scaffolds. Southern did not contest its liability, but Gilles challenged the citation against it and the accompanying proposed fine of $550. The administrative judge decided both that the fatal scaffolding assembly had been constructed in violation of safety regulations properly promulgated pursuant to the Occupational Safety and Health Act of 1970 (OSHA), and that under the statute Gilles was responsible for the violations. Though he found that Gilles was answerable because its payroll employees had access to the zones of danger created by the scaffold, the principal basis of his decision was a broader holding that Gilles, as general contractor, was liable under the Act for safety violations hazardous to employees of subcontractors.

On review, the Commission, in a split decision, reversed. Stating that no payroll employee of Gilles was "affected" by the scaffold's hazardous condition and concluding that Gilles should not be jointly responsible for the hazard which Southern's scaffolding created for Southern's workers, the majority exonerated Gilles. The Secretary appealed.

We conclude that, under OSHA, the Commission was empowered to decide both of the questions of whether a general contractor should be concurrently responsible for the safety of subcontractor workers as a joint employer and of whether proof of employee *access* to the zones of danger created by a safety violation, short of proof of *presence* in the zones of danger, will suffice to support a citation either way. We therefore affirm the Commission's decision that a general contractor is not jointly respon-

sible for the safety of subcontractor workers. However, we must remand the second issue of access versus presence, since the Commission's decision was an unexplained rejection of the administrative judge's decision and an unexplained departure from the rule of decision followed in other OSHA cases that access alone is sufficient to make out a violation. Finally, we sustain the right of the Commission, against the the challenge of the Secretary, to be an active party litigant in the instant proceedings to review.

I.

Gilles was the general contractor for the construction of a fourth-floor addition on a building at the National Aeronautics and Space Administration's (NASA's) Goddard Manned Space Flight Center in Greenbelt, Maryland. Gilles subcontracted the glass construction work on the project to Southern.

Under the construction contract between Gilles and NASA, Gilles was required to submit an accident prevention plan. The plan submitted placed primary safety responsibility on Gilles' job superintendent. His responsibilities included familiarizing himself and pertinent supervisory personnel with the applicable safety regulations, enforcing the accident prevention plan, checking supervisory personnel for compliance with their safety responsibilities, and coordinating Gilles' accident prevention activities with those of the subcontractors. Gilles' responsibilities as a general contractor included overall safety and accident prevention at the construction site.

Gilles' accident prevention plan provided that scaffolds were to be constructed and used in accord "with good practice." Gilles knew the construction standards pertaining to scaffolds, and

---

[1]. Under § 17(k) of the Act, 29 U.S.C. § 666(j) (Supp.1974), where there is "a substantial probability" of "death or serious physical harm," a violation is denominated "serious" unless the employer "did not, and could not with the exercise of reasonable dil-

igence, know of the presence of the violation." While the Act permits a citation without an accompanying fine for nonserious violations, it requires the assessment of a civil penalty for all serious violations. *Id.* § 666(b), (c).

was aware that they required frequent inspections.

The fatal scaffolding units were supplied, constructed, and used by workers on Southern's payroll. The roof top assembly they built consisted of two tubular or patent scaffolding units each holding an I-beam that projected over the roof to support a suspended staging or swinging platform. The I-beams were bound to the wheeled scaffolding units by ¾ inch rope. The counterbalance on each unit consisted of approximately 350 to 400 pounds of elevator weights and roofer cement blocks set unsecured on a plywood platform against a two-by-four at the back of the scaffolding. At first, the units were tied back with rope to eye bolts or window washing rings in the roof. After a few "drops," however, the scaffolding units were no longer tied to the eye bolts in the roof and no other means of securing them were used.

The scaffolding assembly was used by Southern's workers to install windows in the building. Two men and a quantity of glass panes would be lowered to the correct height along the face of the building where the work was to be performed. At the completion of a stage of the work, the entire scaffolding assembly would be moved laterally to a new position where another "drop" would be made. The scaffolding design was of a type very infrequently used in this type of work and was adopted to make the work go faster.

The fatal accident occurred while two of the workers on Southern's payroll were in the process of putting in a set of windows following a routine "drop" down the face of the building. The two men fell to their death, 374 pounds of glass crashed to the ground, and one of the tubular scaffolding units tipped over the parapet dropping 350 to 400 pounds of counterweights on the roof or ground as it tumbled earthward. The Department of Labor's Occupational Safety and Health Administration's Compliance Officer estimated that the debris was spread out over an area 50 feet in diameter.

II.

The administrative law judge held that the patent or tubular scaffolding assembly violated the Secretary of Labor's safety regulation governing scaffolds promulgated pursuant to the Occupational Safety and Health Act, 29 C.F.R. § 1926.451, in three respects: (1) that the failure to secure the counterweights violated 29 C.F.R. § 1926.-451(a)(2), which provides in part that "[u]nstable objects such as barrels, boxes, loose brick, or concrete blocks, shall not be used to support scaffolds or planks," (2) that the scaffolding assembly violated ¶ (2) of 29 C.F.R. § 1926.-451(g) covering outrigger scaffolds which requires that "the inboard ends of outrigger beams shall be secured against tipping and the entire supporting structure shall be securely braced in both directions to prevent any horizontal movement," and (3) that the scaffold assembly violated 29 C.F.R. § 1926.-451(a)(7) which provides that "[s]caffolds and their components shall be capable of supporting without failure at least 4 times the maximum intended load." Since the parties had stipulated that the amount of the proposed $550 penalty was reasonable and that the scaffolding assembly's noncompliance with the safety standards constituted a "serious violation" under the Act, the only question remaining was whether Gilles was responsible for the violation. On the factual predicates that Gilles was responsible for safety at the job site and was aware of the construction standards pertaining to scaffolds, the administrative judge ruled that Gilles was legally responsible under the Act for the violations on two grounds: (1) Gilles' workers, as well as those of other subcontractors, had "access" to the hazard and "could have been in a position to suffer injury from the collapse of the scaffolding," and (2) alternatively, Gilles was responsible for safety violations hazardous to subcontractors' workers such as Southern's because "in the construction of a building where subcontractors are also used it is logical and necessary that

overall safety and accident prevention be the responsibility of the general contractor."

Discretionary review by the Occupational Safety and Health Review Commission was invoked, and in a 2–1 decision, the Commission reversed. The majority rejected the administrative judge's first ground of decision that workers on Gilles' payroll had access to the scaffold's danger zones with the simple, unelaborated statement that "no employee of the Respondent herein used the scaffold and no employee of this Respondent was affected by any alleged unsafe condition of the scaffold." Addressing the remainder of its opinion to the second ground of decision, the majority held that Gilles, as a general contractor, was not responsible for safety violations hazardous to Southern's workmen because it was not "in fact" an "employer" of the subcontractor's workers—and thus, under the majority's interpretation of the Act, did not owe them any duty —and because it was "unfair" and did not "further the purposes of th[e] Act" to make Gilles jointly responsible with Southern when Southern had the means to abate the violation—the right to direct and to control the workers on its payroll. The dissenting Commissioner would have upheld the citation and penalty on the narrow basis of the administrative judge's first ground of decision, that the scaffold created a hazard for workers on Gilles' payroll.

### III.

A. Because OSHA is still a relatively new and unfamiliar piece of federal legislation, and because a general understanding of the structure and objectives of the legislation is necessary to the resolution of the specific issues presented by this case, a brief description of the Act must be supplied. Congress enacted OSHA for the declared purpose of assuring "so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S. C. § 651(b) (Supp.1974). Confronting a legislative record which showed that each year 14,500 workers died and two million were disabled because of their jobs, resulting in $1.5 billion in lost wages and an $8 billion loss to the GNP, *see* Subcommittee on Labor, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970, 831, 844 (Comm. Print 1971) [hereinafter Legislative History], Congress passed a wide-ranging bill, characterized by one commentator as "the most revolutionary piece of 'labor' legislation since the National Labor Relations Act." White & Carney, OSHA Comes of Age: The Law of Work Place Environment, 28 Bus.Law 1309 (1973). Although the Act provides for various governmental actions such as research and related activities, 29 U.S.C. § 669 (Supp.1974), training and employee education, *Id.* § 670, and the compilation of statistics, *Id.* § 673, the bulk of the Act and the extensive legislative history are concerned with the promulgation of health and safety standards for private employers, and administrative and judicial enforcement procedures. The operative provision setting forth a private employer's duties under the Act is § 5(a), which provides that:

Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this Act. 29 U.S.C. § 654 (Supp.1974).

The authority to promulgate safety and health standards is vested in the Secretary of Labor, who is also authorized to inspect and to investigate, 29 U.S.C. § 657 (Supp.1974), to cite employers for violations and to fix a reasonable time for abatement of violations, 29 U.S.C. § 658 (Supp.1974), and, in appropriate cases, to establish proposed penalties up to a statutory ceiling of $1,000 in most cases, which will become final if uncontested. 29 U.S.C. §§ 659, 666 (Supp.

1974). Employers, unions, and individual employees can contest the Secretary's action before an administrative judge of the Occupational Safety and Health Review Commission, and discretionary review lies with the three-member Presidentially-appointed commission itself. *See* 29 U.S.C. §§ 659(c), 661 (Supp. 1974). The Commission is independent of the Secretary of Labor because Congress thought that there would be greater confidence in the legislation and better compliance if adjudicatory functions were housed in a separate agency. *See* Legislative History, supra, 462–64, 470–73, 1147 (remarks of Senators Javits, Holland, Dominick and Williams.)

 B. In this petition for review, we need decide only the issue of whether, in addition to a subcontractor, a general contractor should be responsible for safety violations hazardous to a subcontractor's workers. The case arises in the factual context of the construction industry in which, unlike the typical single-employer business, the specialized workmen of a number of contractors customarily occupy the same workplace. Since the Secretary has issued an interpretative regulation limiting the effect of the safety regulations promulgated under § 5(a)(2) of the Act to the employment relationship, see 29 C.F.R. § 1910.5(d),[2] we do not reach the question of whether Congress has granted the Secretary authority under § 5(a)(2) to require employers in multiple-employer industries to obey safety regulations for the protection of other employers' workmen, for in this enforcement proceeding the Secretary is bound by his own rules. Cf. United States v. Walden, 490 F.2d 372, 374–376 (4 Cir. 1974); United States v. Heffner, 420 F.2d 809 (4 Cir.

1969). As a result, in this case the issue of Gilles' responsibility for the safety of Southern's workers is presented only in the context of the specific question of whether the term "employer" should be interpreted to cover general contractors as "joint employers," cf. Boire v. Greyhound, 376 U.S. 473, 84 S. Ct. 894, 11 L.Ed.2d 849 (1964), or "statutory employers."

The statute itself does not answer the question. The Act depends wholly on the brief language of § 5's general and specific duty clauses—respectively requiring "employers" to provide employment free of recognized hazards and to comply with safety standards promulgated by the Secretary. The legislation makes no specific reference to the special situation of a general contractor in the multiple-employer construction industry. Compare 9A Va.Code Ann. §§ 65.1–29 to 65.1–34 (1973 replacement volume) (Workmen's Compensation Statute). In addition, the Act's general definitions of "employer" and "employee" are uninformative to the issue at hand since they are framed in terms of Congress' power over interstate commerce under Article I, § 8 of the Constitution.[3]

Since the statute does not, on its face, provide an answer to the specific question of a general contractor's concurrent responsibility for the safety of a subcontractor's workers, reference to the statutory purpose behind the Act is especially necessary to arrive at an interpretation of the statute consistent with the objectives Congress sought to achieve through this legislation. This is a legal inquiry, not a factual one, as the Commission supposed.[4]

---

2. In pertinent part, the regulation states that:

> In the event a standard protects on its face a class of persons larger than employees, the standard shall be applicable under this part only to employees and their employment and places of employment.

3. Section 3 of the Act defines "employer" as "a person engaged in a business affecting commerce who has employees, but does not

include the United States or any State or political subdivision of a State," and "employee" as "an employee of an employer who is employed in a business of his employer which affects commerce." 29 U.S.C. § 652(5) & (6) (Supp.1974).

4. Addressing this point in his treatise, Professor Jaffe explains:

> But the problem of analysis is further complicated where a word of common meaning is itself used in a statute. In

■ In determining whether Gilles should be held to be a joint employer subject to the obligations which § 5 of the Act imposes on "employers," reference could be made to the common law. However, in determining the precise contours of the word "employer" and thus the reach of the Act, we do not believe, as the Commission apparently did, that proper statutory interpretation involves uncritical wholesale adoption of the common law definition of "master" or "employer" determined under the so-called "control" test: a superior who has the right, not only to specify the objectives of a subordinate's service, but also "to control the physical conduct of the other in the performance of the service." Restat. Agency 2d, § 2. *See* Chemical Workers Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 168, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). The common law definition of employer was and is being evolved for the purpose of determining a superior's liability to third persons for the torts of his subordinates. *See, e. g.,* Restat. Agency 2d, § 2, Comment, Jaffe, supra n. 4, 559. Hence, the scope of the common law definition of employer is determined by reference to the purposes of the tort law doctrine of respondeat superior, and not the purposes of OSHA.

A common law definition of employer is also unsuitable as the dispositive interpretation of the statutory term because the states differ on the proper scope of the term in various situations, and thus there is no uniform nationwide definition. *See* NLRB v. Hearst Publications, Inc., 322 U.S. 111, 120–124, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). As a Congressional enactment of nationwide application, OSHA requires a single consistent definition of "employer" throughout the country so that there will be uniform application of this national legislation in all states. Cf. *Id.*

■ Over the years, Congress has enacted much social legislation similar to OSHA, imposing duties on "employers" for the benefit of their "employees." Since an employment relationship is the predicate for the operation of all these statutes, the Court has had to consider the proper definition of employer and employee to determine the reach of these statutes. In a line of cases involving the delineation of the outer perimeter of statutes' coverage through the definition of employer and employee, the Court has established the purpose of the statute and not the technical distinctions of the common law as the referent of decision. *See* Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (Fair Labor Standards Act); United States v. Silk, 331 U.S. 704, 713, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (Social Security Act); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (FLSA); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (Wagner Act). We therefore apply that test here.

■ C. As we view the statutory purposes of OSHA, the question of whether a general contractor should be concurrently responsible for the safety of subcontractor workmen under the concept of a joint or statutory employer can be answered either way. It follows that since Congress has chosen the Occupational Safety and Health Review Commission as the enforcing agency, the choice between these alternatives is ap-

such cases judges are tempted to argue that the application of the word involves a purely factual finding, and is therefore not subject to the judicial control which is appropriate to conclusions of law. It soon appears, however, that this analysis is insufficient. Words, particularly common ones, rarely have a single meaning, and disputes inevitably arise as to whether a given word does or does not describe the phenomenon in question. In such a situation the dispute must be resolved by reference to the purposes of the statute and the question is thus one of law. L. Jaffe, Judicial Control of Administrative Action, 551 (abridged ed. 1965).

**1262**

propriately committed to it. *See, e. g.,* Udall v. Tallman, 380 U.S. 1, 15, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Hearst Publications, supra,* 322 U.S. at 130–131, 64 S.Ct. 851; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941); Bates & Guild Co. v. Payne, 194 U.S. 106, 109–110, 24 S.Ct. 595, 48 L.Ed. 894 (1904); *Jaffe, supra,* n. 4, ch. 14.

The Secretary agrees that the issue of a general contractor's joint responsibility for safety violations hazardous to subcontractor workmen is committed to agency discretion, but he argues that the issue should be committed to his discretion, not that of the Commission. In support of this position, he points out that Congress gave him broad powers to promulgate safety standards, to cite apparent safety violations, and generally to perform almost all administrative functions under the Act save that of adjudication. While the Secretary's rule-making authority is broad, he has adopted no regulation on the subject at issue, and it is the power to adopt rules or policies *in adjudication* which we are concerned with in this case. The statute vests adjudicatory functions in the Commission. Moreover, as is made clear by the lengthy Congressional debates over enforcement procedures and the successful floor amendment withdrawing the Secretary's authority over adjudication, *see* Legislative History, supra, 377, 388, 462–64, 470–73, 1147 (text of amendment and remarks of Senators Javits —sponsor of the amendment—Holland, Dominick, and Williams), Congress deliberately created the Commission separate and independent of the Secretary.

■ To accept the Secretary's position would mean that the Commission would be little more than a specialized jury, an agency charged only with fact finding. But, as we read the statute, the Commission was designed to have a policy role and its discretion therefore includes some questions of law. *See* Brennan v. OSHRC & Republic Creosoting Co., 501 F.2d 1196 (7 Cir., No. 73–1304, Aug. 16, 1974). Rather than placing the trial of alleged violations in the

federal district courts and state trial courts, *see* Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., where there could be wholly independent determinations of questions of law by reviewing appellate courts, Congress instead created a specialized agency and spelled out in the statute itself that it would be composed of persons specially qualified "by reason of training, education, or experience." *See* OSHA, § 12(a), 29 U.S. C. § 661(a) (Supp.1974). Moreover, Congress intended that this agency would have the normal complement of adjudicatory powers possessed by traditional administrative agencies such as the Federal Trade Commission. *See, e. g.,* Legislative History, supra, 462, 465 (remarks of Senator Javits, sponsor of the successful floor amendment creating the Commission).

Thus, we are persuaded, and so hold, that since the statutory objectives of the safety act allow decision either way on the necessity for concurrent "employer" enforcement of safety standards, the decision on a general contractor's joint responsibility for subcontractor workmen is vested in those commissioners and administrative judges intimately familiar through day-to-day adjudication with economic realities such as the working relationships between general contractors and subcontractors' workmen, general contractors' knowledge of safety hazards in specialized trades, and unusually dangerous industries requiring reenforced implementation of safety standards, and their interpretation should be accepted. Of course they should be guided by these "economic realities" in interpreting the terms "employer" and "employee" in a manner to achieve statutory objectives. *See, e. g., Whitaker, supra,* 366 U.S. at 28, 81 S.Ct. 933; *Silk, supra,* 331 U.S. at 713, 67 S.Ct. 1463; *Hearst, supra,* 322 U.S. at 129, 64 S.Ct. 851. Since the Commission has held that a general contractor should not be held responsible jointly with a subcontractor for the safety of the latter's employees, we accept the decision as binding.

## IV.

■ The question remains whether Gilles is responsible as an employer of its own payroll employees. On the facts of this case, Gilles' responsibility for the scaffold as a direct employer of its own payroll workers turns on a question of law crucial to the enforcement of the Act: whether employee *access* to the zones of danger created by a safety violation suffices to support a citation or whether proof of actual presence is required.

The record in this case contains no evidence that Gilles' payroll workers actually were present in the zones of danger beneath the scaffold, on the suspended platform, or near the patent assemblies on the roof. The record does permit a finding that Gilles' payroll employees had access to the zones of danger. Thus, while there is no indication in the record that any of Gilles' payroll workers were ever on the suspended platform, it does appear that the scaffolding was available for inspection use since a NASA inspector testified to his use of the platform for that purpose. In addition, while no Gilles payroll worker testified that he walked beneath the fatally defective rigging, Gilles had approximately 30 workers on the relatively limited job site who could have passed through the zone of danger. Indeed, Joseph Krewatch, Gilles' vice-president in charge of construction projects, who visited the construction site approximately once a week, was at the job on the Friday the accident occurred. He testified:

> I was at the job many times when the windows were going up and *I saw the operation from the ground; I saw it from the roof.* Just specifically, I can't remember just where or what exactly was taking place. (Emphasis added.)

The possibility of Gilles' payroll workers' entering one of the zones of danger is also shown by the fact that Gilles' job superintendent James Diven, who was primarily responsible for safety at the construction site, observed the treacherous scaffolding units on the roof. However, at the time he made his observations, the scaffolding assembly was tied back to the eye bolts.

While the record does not reveal what tasks were performed by the workers on Gilles' payroll, it does show that there were roofers and possibly laborers on the roof during the most hazardous period when the scaffolding was not secured to the eye bolts and thus that there was access to the zones of danger on the roof by those not on Southern's payroll.

The question of whether a citation can issue solely on the basis of employee access to the zones of danger created by a safety violation, or whether specific evidence of employee presence in the zone of danger is required, is important to enforcement of the Act. If access alone is sufficient to show a violation, the Secretary will often be able to make out a case solely on the basis of the testimony of the compliance officer. If, however, proof of employee presence in the zones of danger is required, then unless the compliance officer chances to see employees in a danger zone at the time of his inspection, the Secretary will have to depend on workers' willingness to testify against their employers under the anti-retribution umbrella of § 11(c)(1) of the Act. Recalcitrant employers may be able to impede enforcement of the Act by refusing to correct safety violations disclosed by an inspection unless for each and every violation the Secretary is able to marshal employee testimony that, e. g., dangerous equipment available for use was actually used or that hazardous areas accessible to workers were at one time passed through or occupied.

We think that the issue of whether a citation can be predicated on access alone, or whether evidence of actual employee exposure to a hazard is required, can be answered either way consistent with the statutory purposes of the Act. Because the policy arguments bearing on the choice between access and actual exposure are particularly susceptible to sound resolution by those whose every-

**1264**

day responsibilities familiarize them with employer resistance or compliance with the Act, worker willingness to testify, compliance officer overreaching, and the significance in various industrial settings of the distinction between access and actual exposure, we believe that decision should be left to the agency Congress entrusted to effectuate the goals of the statute. *See* Legislative History, supra, 462–64, 470–73. The Commission's expertise and experience in adjudicating safety violations in a great number of cases specially equip it to decide this question.[5] We decline to freeze interpretation, for further enforcement experience may well demonstrate the wisdom of distinctions and exceptions, if not outright change.

While the choice between access and actual exposure is committed to the Commission's discretion, and indeed would seem to be determinative of Gilles' liability in this case, the opinion of the Commission majority does not expressly decide the question,[6] much less provide the thoroughgoing statement of reasons the issue deserves.

■■ Two reasons therefore require us to reverse and to remand for an express decision of the issue of "access" versus "actual exposure." First, administrative agencies must explain the grounds for their rejection of an administrative judge's disposition of a case. *See* Lorain Journal Co. v. FCC, 122 U.S.App.D.C., 127, 351 F.2d 824, 828 (1965). Since the administrative judge in the instant case rested his decision on the "access" principle, the Commission must explain its rationale for rejecting his disposition. Second, while administrative agencies can change previously announced policies, *see, e. g.,* NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), and can fashion exceptions and qualifications, they must explain departures from agency policies or rules apparently dispositive of a case. *See* NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); City of Lawrence v. CAB, 343 F.2d 583 (1 Cir. 1965); Mary Carter Paint Co. v. FTC, 333 F.2d 654 (5 Cir. 1964) (especially concurring opinion of Brown, J). The

---

5. We note that § 8(g)(2) of the Act provides that:

[t]he Secretary [of Labor] and the Secretary of Health, Education, and Welfare shall each prescribe such rules and regulations as he may deem necessary to carry out their (sic) responsibilities under this Act, including rules and regulations dealing with the inspection of an employer's establishment.

No rule promulgated by the Secretary of Labor under this section bearing on the choice between access and actual exposure has been drawn to our attention and we therefore decline to speculate on the scope of the Secretary's rule-making authority under this section and on whether any possible rule would differ from the Commission's interpretation.

6. It is true that the majority reversed the administrative judge who had held Gilles liable because the contractor's payroll workers had "access" to the zones of danger and thus "could have been in a position to suffer injury from the collapse of the scaffolding." Indeed, this disposition of the case was taken over the dissent of the remaining commissioner who agreed with both the administrative judge's decision and his "access" rationale. However, the majority's action can-

not be taken with any assuredness to be even an implied decision of the "access" versus "actual exposure" issue, since the majority may have been relying on an unexpressed principle of law which allowed reversal of the administrative judge without reaching his "access" rationale, and even if the majority rejected the "access" principle, it did not necessarily consciously embrace the "actual exposure" rule.

We do not foreclose the possibility that the Commission's decision did result—or on remand could result—from the application of a rule of decision which would obviate the need to reach the "access" versus "actual exposure" issue. However, the opinion reveals no such rule of decision, and neither appellate counsel nor this court can supply one. *See* NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Since the "access" versus "actual exposure" issue is an important policy question apparently dispositive of the case, for the reasons set forth in text, we require the Commission to disclose its rule of decision and accompanying rationale.

latter rule is applicable because in the two Commission cases which appear expressly to decide the issue of "access" versus "actual exposure," the rule of decision was that a citation could be supported on proof of access alone. See Harold Christiansen, —— OSHRC Rpts ——, (No. 3108, Feb. 21, 1974); Allied Electric Co., 1 OSHRC Rpts 440 (1972). Hence, while the Commission may choose to reject this principle or to distinguish those cases, it must set forth fully its reasons for doing so. *See* Barrett v. United States, 326 U.S. 179, 65 S.Ct. 1504, 89 L.Ed. 2128 (1945); NLRB v. Pittsburgh Plate Glass, 270 F. 2d 167 (4 Cir. 1959); Northeast Airlines v. CAB, 331 F.2d 579, 589 (1 Cir. 1965); Sunbeam Television Corp. v. FCC, 100 U.S.App.D.C. 82, 243 F.2d 26 (1957). We refer to the *Allied Electrical Company* and the *Harold Christiansen* decisions:

In *Allied Electric Company, supra,* a Labor Department Compliance Officer issued a citation against an electrical subcontractor for an electric skillsaw which had had its ground prong cut off. The electric saw was located in a locked toolbox on a pickup truck parked near the building undergoing remodeling. The regulation allegedly violated provided that "[t]he non-current-carrying metal parts of portable and/or plug-connected equipment shall be grounded." 29 C.F.R. § 1518.401(a)(1). The Secretary argued that it was not necessary to show "actual use" of defective equipment and concluded that "mere possession of equipment which fails to meet a safety standard is a violation." 1 OSHRC Rpts at 451. The Commission judge agreed that it was not necessary to show that employers had actually been exposed to the danger created by the safety hazard.

It would be an undue burden on the petitioner to require a showing of actual use of defective equipment. Any such requirement would cause the compliance officer to wait around in hopes of someone using the equipment. This would result in a cat-

and-mouse game as contended by the petitioner. More importantly, it would expose an employer to a hazard prior to the Secretary being able to require it to be corrected. 1 OSHRC Rpts at 451.

Thus, under *Allied Electric,* specific proof that employees were in the zone of danger is not required. However, the administrative judge rejected the position that "mere possession" of defective equipment constituted a violation. Instead, he held that

[t]he objective of the Act can best be accomplished by placing emphasis on the *accessibility* of the employee to the defective equipment. If the defective equipment is available for use by the employee and a standard is violated, then a citation should issue. Under such circumstances, the employee is exposed to potential hazard even if he is not using the equipment at the time of the inspection. The equipment is *accessible* to him and could be used.

Where the employer asserts his intention not to use the defective equipment until repaired and his contention is manifested in overt acts which have denied *accessibility* to the equipment by the employees, then the employer should not be held in violation of the particular safety standard which might apply to that equipment. 1 OSHRC Rpts at 451–52. (Emphasis supplied.)

Thus, in resolving the issue of "access" versus "actual use," *Allied Electric* clearly and forcefully supports access.

*Allied Electric's* access rationale was followed by a different administrative judge in *Harold Christiansen.* That case involved a violation of the same grounding regulation presented in *Allied Electric.* The ground plugs on a portable electric drill and a portable electric chipping hammer had been removed. The electrical subcontractor argued that the Secretary had failed to show that any of his employees ever used the tools, but the Commission judge upheld the ci-

tation and proposed penalty on the ground that the employees had access to the hazardous equipment, which was located in a "gang box" on the fourth floor of the construction project. In holding that accessibility rather than actual use sufficed to make out a violation, the administrative judge expressly followed *Allied Electric,* quoting the language set forth above.

Despite the opinions rejecting an actual use requirement and adopting accessibility as the rule of decision, the Commission argues that other OSHA cases have required the Secretary to show that employees actually passed through a zone of danger. *See* City Wide Truckpointing Service Co., —— OSHRC Rpts ——, (No. 274, Commn.1973), 1 (CCH) OSHD ¶ 15,769; A. L. Amaral Co., —— OSHRC Rpts —— (No. 2515, Feb. 21, 1974); Ellison Electric, 1 OSHRC Rpts 547, 1 (CCH) OSHD ¶ 15,133, 1 (BNA) OSHC 3034 (1972). However, none of these cases expressly considered the distinction between access and actual presence in a zone of danger. In addition, in *A. L. Amaral Co.,* the Secretary was able to meet the more demanding standard of actual presence in a zone of danger, and in *City Wide Truckpointing* there was a somewhat unusual regulation which by its very terms made violations contingent on employees being required to work in, or pass through, the danger zone. In any event, giving these cases the interpretation urged by Commission's counsel at best does no more than convince us that there is an apparent inconsistency in OSHA decisions which requires a remand in the instant case in order that the Commission may expressly state the principle and supporting rationale guiding its decision in the instant case.

## V.

In his reply brief, the Secretary raised for the first time the argument that the Commission may not assume active party status in review proceedings in the courts of appeals. Although administrative agencies have traditionally been allowed to defend their decisions in the courts of appeals, *see* Davis, Administrative Law § 22.15, p. 283, n. 23 (1958)—even in the absence of statutory authority, *see* FTC v. Dean Foods Co., 384 U.S. 597, 607, 86 S.Ct. 1738, 16 L. Ed.2d 802 (1966)—and under Rule 15(a) of the Federal Rules of Appellate Procedure must be named as a respondent in petitions to review their orders, the Secretary argues that because the Commission has only adjudicatory responsibilities under the Act, it should be treated like a federal district court and should not be permitted to appear, file briefs, or argue to the court.

Ordinarily, in the absence of special justifying circumstances, we would not consider an issue untimely raised. Cf. Mississippi River Corp. v. FTC, 454 F.2d 1083, 1093 (8 Cir. 1972); Finsky v. Union Carbide Corp., 249 F.2d 449, 459 (7 Cir. 1957). However, in light of the public importance of the question presented in the instant case, we do not rest our decision on a procedural ground alone.

It is true, as the Secretary points out, that the Act divides adjudicatory functions from prosecutorial responsibilities and other administrative functions. However, instead of concluding that the Act's division of functions between the Secretary and the Commission makes it appropriate to view the Commission as a lower court unable to appear and to defend its decisions in appellate proceedings, it seems more appropriate to us to conclude that an administrative body like the Commission possesses the powers normally exercised by such administrative agencies,[7] and that the significance of the division of responsibilities between the Commission and the Secretary is that the Secretary, unlike the prosecutorial arm of most ad-

---

7. *See, e. g.,* Legislative History, supra, 462, 465 (remarks of Senator Javits, sponsor of the floor amendment creating the indepen-

dent Commission) (The Commission "will have the same type of authority that the Federal Trade Commission exercises.")

ministrative agencies, *e. g.,* the General Counsel of the NLRB, is able to appear in the courts of appeals to challenge final administrative determinations.

 In any event, we note that in OSHA, Congress did not place adjudication in the federal district courts, *compare, e. g.,* Federal Employers Liability Act, 45 U.S.C. § 51 et seq., and thus confer jurisdiction on tribunals which both are unable to appear in the courts of appeals to defend their opinions and are subject to a broad scope of review allowing *de novo* appellate determinations of all policy questions. Instead, Congress placed adjudicatory functions in the Commission, which is required by statute to be composed of persons specially expert in health and safety matters. *See* 29 U.S.C. § 661(a) (Supp.1974). The Commission is subject to a narrow scope of review which requires the courts of appeals to defer to Commission decisions of policy questions within their relatively broad area of discretion. *See* §§ III C and IV su-

pra; Brennan v. Republic Creosoting Co., 501 F.2d 1196 (7 Cir. No. 73–1304, Aug. 16, 1974). We think that it is appropriate for the Commission to appear in the courts of appeals to defend the policies Congress empowered it to adopt in adjudication.[8]

The fact that § 17 of the Act permits the assessment of no monetary penalty at all for nonserious violations, sets a ceiling of $1,000 in most cases for both serious and nonserious violations, and in effect allows "credits" for the size of a business, good faith, and a clean record, adds additional support to our conclusion. Under such a statute, there will often be inadequate financial justification for employers who have prevailed before the Commission to defend the Commission's decision through costly appellate litigation. To make the statute's provision for judicial review effective, the Commission must appear to ensure that both sides of issues are presented.

Vacated and remanded.

---

FTC v. Dean Foods, Inc., supra, 348 U.S. at 607, 86 S.Ct. 1738 (Federal Trade Commission possesses ancillary nonstatutory power to appear in review proceedings.)

8. The Commission argues that it is given active party status by the Act itself. It points out that in setting forth the procedures for obtaining review of Commission orders, the Act provides that the Secretary or any private party

. . . aggrieved by an order of the Commission . . . may obtain a review of such order . . . by filing in [the appropriate court of appeals] within sixty days following the issuance of such order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court *to the Commission* and *to the other parties,* and thereupon the Commission shall file in the court the record in the proceeding . . . .

(Emphasis supplied.) Occupational Safety and Health Act of 1970 § 11(a) & (b), 29 U.S.C. § 660(a) & (b) (Supp.1974). The Commission reasons that since the clerk of the court must forward copies of the petition to the Commission and "other parties," the clear inference is that the Commission is a party.

We agree that this is one possible interpretation of the statute, but it is also possible to read this statutory language as requiring the clerk of the court to provide copies of the petition to all "other parties" except the petitioner, who would presumably already have a copy of his own petition. Since the section is obviously directed at the procedures for informing all interested persons of the filing of a petition for review, it gives at best only an oblique indication of the Commission's party status, and we do not think it determinative.