[No. 53309-1. En Banc. March 3, 1988.]

JERRY ADKINS, ET AL, *Appellants,* v. ALUMINUM COMPANY OF AMERICA, *Respondent.*

---

130

*Duane Lansverk* (of *Landerholm, Memovich, Lansverk, Whitesides, Wilkinson, Klossner & Perry, Inc., P.S.*), for appellants.

*Bullivant, Houser, Bailey, Hanna, Pendergrass, Hoffman, O'Connell & Goyak,* by *R. Daniel Lindahl,* for respondent.

Andersen, J.—

## Facts of Case

This is a personal injury suit brought by Jerry Adkins[1] against the Aluminum Company of America (ALCOA) for injuries he sustained while working as a roofer on a building owned by ALCOA. Following the liability phase of a bifurcated first trial, the jury returned a verdict finding ALCOA 80 percent negligent and Mr. Adkins 20 percent negligent. The trial court, however, granted ALCOA's motion for a mistrial made after the liability verdict was returned; ALCOA's motion was based upon the jury's use of a law dictionary during deliberations. Following retrial, the second jury returned a verdict in favor of ALCOA on the liability issue. Judgment was entered accordingly. Mr. Adkins appealed, raising a number of issues. We accepted

---

[1]Although Jerry Adkins and Teresa Adkins, husband and wife, are the named plaintiffs, for convenience of reference herein, we will refer to Mr. Adkins as though he were the sole party plaintiff.

the Court of Appeals certification of the case to this court.[2]
We reverse on the basis of improper jury argument and
remand for a new trial.

In 1980, ALCOA contracted with Wagner Roofing to do
maintenance work on some of its buildings in Vancouver,
Washington. Mr. Adkins, an employee of Wagner Roofing,
worked on one of the roofs. On August 7, 1980, Mr. Adkins
was on the roof to finish caulking the flashing on the inside
of a precast concrete parapet around the roof. He placed
several tubes of caulk under the weather cap of an exhaust
vent, across the opening, in order to warm the caulk. One
tube fell into the vent. He removed the weather cap from
the vent, simply by lifting it off, and looked inside. He
could see the tube lying in an elbow of the duct, about 2
feet down. He reached down into the duct to retrieve the
tube of caulk. He was injured when his hand was caught in
a moving fan which the tube of caulk had missed.

Mr. Adkins brought this action against ALCOA. The
parties and the court agreed to bifurcate the trial, with the
same jury hearing both the liability and damages phases. At
the conclusion of the 6–day liability phase, the jury began
deliberations. During the evening deliberations, one juror
asked the bailiff for a dictionary. Unfortunately, the bailiff
supplied the jury with a 1933 Black's Law Dictionary.
Later, the bailiff told the judge what she had done. After
the jurors returned their verdict finding ALCOA 80 percent
negligent and Adkins 20 percent negligent, the judge ques-
tioned the jurors about their use of the dictionary. The
jurors stated that they had looked up the definitions of the
terms "negligence" and "proximate cause".

ALCOA moved for a mistrial, which the court granted on
the basis that it could not reasonably say that the jury was
not influenced by the dictionary. Adkins did not then
appeal the court's oral ruling. In a separate action, he sued
Clark County and the State of Washington for damages
claimed to be caused by the mistrial. Ultimately, this court
held that the bailiff's conduct was protected by judicial

---

[2]RCW 2.06.030.

immunity, and affirmed the trial court's dismissal of that action on summary judgment.[3]

Upon retrial of the present action, Adkins' theories of ALCOA's liability were that ALCOA was negligent as owner of the building, and that ALCOA violated a duty to provide him with a safe workplace. Among other things, he sought to establish that ALCOA was negligent per se for not complying with certain regulations, promulgated under the Washington Industrial Safety and Health Act of 1973 (WISHA),[4] pertaining to machine guarding and warning signs. The court ruled that as a matter of law the regulations did not apply and declined to allow testimony about these regulations or about similar Occupational Safety and Health Act (OSHA)[5] regulations. The trial court did, however, allow testimony on the advisory American National Standards Institute (ANSI)[6] codes relating to machine guarding and warning signs.

During the retrial, the trial court granted ALCOA's request for a jury view of the vent. Adkins objected to the view, but withdrew his objection before the jury viewed the premises.

On the fifth day of the retrial, a Tuesday, the trial judge told counsel that on the previous Saturday he had attended a dinner party given by ALCOA's political action committee, WAPAC. The judge believed that the dinner party was to be given by ALCOA's workers' union, but learned that evening that WAPAC instead is an organization of ALCOA management and stockholders. Two of ALCOA's witnesses in this case also attended the party. As the judge advised counsel, he did not talk to either witness other than to say "hello" and that he was not going to be able to talk to them

---

[3] *Adkins v. Clark Cy.*, 105 Wn.2d 675, 717 P.2d 275 (1986).

[4] RCW 49.17.

[5] 29 U.S.C. §§ 651–678 (1970).

[6] *See, e.g.*, American Nat'l Standards Inst., *Mechanical Power Transmission Apparatus*, ANSI B15.1 (1972).

further. He explained that he only stayed because he thought leaving would be discourteous. After explaining the matter, the judge invited the parties to make any motions they desired to make based on the incident. Adkins' counsel advised that Adkins had instructed him that he did not want to move for a mistrial. No motions were made.

During final argument, ALCOA's counsel made statements which Adkins objected to as asking the jurors to place themselves in ALCOA's position. Following the objection, which was made out of the jury's presence, counsel requested the court to instruct the jury that it was an improper argument and that the jury should not consider it. The court overruled the objection and denied the request. Subsequently, Adkins made a post–trial motion for a new trial based upon the allegedly improper argument.

The trial court submitted to the jury the question of Adkins' status as an invitee or a trespasser at the time he put his hand into the vent. Adkins excepted to jury instructions respecting his status, and argued that the court should have ruled as a matter of law that he was not a trespasser.

The jury returned a verdict in favor of ALCOA on liability. Adkins appeals from the judgment entered on the jury verdict raising several issues. ALCOA also raises an issue pursuant to RAP 2.4(a).

Six principal issues are presented for our review.

## ISSUES

ISSUE ONE. Is the trial court's oral ruling granting the mistrial (due to the first jury's use of the law dictionary) reviewable upon this appeal from the judgment entered on the second jury's verdict?

ISSUE TWO. Did the trial court err by granting ALCOA's motion for a mistrial based upon the jury's use of a law dictionary during deliberations?

ISSUE THREE. During final argument, did ALCOA's counsel improperly urge the jurors to place themselves in ALCOA's position and to consider what they would then want and, if so, is reversal required?

Issue Four. Did the trial court err when it ruled that certain machine guarding and warning sign regulations do not apply to this case?

Issue Five. Did the trial court properly submit to the jury the question of Mr. Adkins' status as an invitee or trespasser at the time he put his hand into the vent where the fan was?

Issue Six. (ALCOA's assignment of error.) Did the trial court err by ruling that ALCOA owed Mr. Adkins a non-delegable general duty to provide a safe workplace pursuant to RCW 49.17.060?

## Decision

Issue One.

Conclusion. Pursuant to RAP 2.4(b), the trial court's ruling on the motion for a mistrial is reviewable at this time.

RAP 2.4(b) provides:

The appellate court will review a trial court order or ruling not designated in the notice, including an appealable order, if (1) the order or ruling prejudicially affects the decision designated in the notice, and (2) the order is entered, or the ruling is made, before the appellate court accepts review.

As noted in the comment at the time RAP 2.4(b) was adopted in 1976, a trap for the unwary existed under prior rules in that a failure to appeal an appealable order could prevent its review upon appeal from a final judgment.[7] It is not always clear, however, what is an appealable order. RAP 2.4(b) solved the problem by including prior appealable orders within the scope of review.[8]

 The requirements of RAP 2.4(b) are satisfied here. The second trial would not have occurred absent the trial court's decision granting the motion for a mistrial; thus the decision prejudicially affected the final decision which was designated in the notice of appeal. Obviously the trial

---

[7]*See* Comment, RAP 2.4(b), 86 Wn.2d 1150 (1976).

[8]Comment, RAP 2.4(b), 86 Wn.2d 1150 (1976).

court's action granting the mistrial occurred before the Court of Appeals accepted review.

ALCOA maintains, however, that the trial court's action falls within the scope of RAP 2.2(a)(9), providing that a grant or denial of a motion for a new trial is appealable as a matter of right, and RAP 5.2(e), providing that a notice of appeal of an order on a post–trial motion for a new trial must be filed within 30 days after entry of the order. ALCOA maintains that Adkins failed to timely file an appeal from the decision granting the mistrial. This argument is not persuasive.

First, RAP 2.2(a)(9) and RAP 5.2(e) expressly apply to motions for a new trial. The trial court's decision here at issue was a decision on a motion for a mistrial following only the liability phase of a bifurcated trial. Second, under RAP 2.2(a)(9) a denial of a motion for a new trial is appealable as a matter of right. To apply the rule by analogy to motions for mistrial would result in the untenable premise that a denial of a motion for mistrial would be appealable as a matter of right. We conclude that neither RAP 2.2(a)(9) nor RAP 5.2(e) applies here, even by analogy, to override the express provision of RAP 2.4(b). Were we to do otherwise, our decision would be inconsistent with the purpose of RAP 2.4(b) to avoid the problem of precluding review of an order which is not readily identifiable as appealable.

ALCOA further reasons that multiple trials are inefficient and therefore Adkins should not, after a second trial, be permitted to obtain review of the decision granting the mistrial. Under RAP 2.4(b), however, one beneficial effect is the avoidance of undesirable piecemeal appeals.

ISSUE Two.

CONCLUSION. Whether the incident involving the dictionary is viewed as bailiff misconduct in supplying out–of–court information to the jury during its deliberations, or as jury misconduct due to the jury's use of the law dictionary, the trial court did not abuse its discretion in granting ALCOA's motion for a mistrial. In either case the court

could have reasonably concluded that the misconduct affected the jury's verdict.

A decision granting or denying a motion for a mistrial, as in the case of a motion for a new trial, is discretionary with the trial court.[9] This principle is subject to the limitation that, when an order granting or denying a motion for a mistrial is predicated upon rulings as to the law, no element of discretion is involved.[10] Adkins maintains that the only question here is one of law, that no element of discretion is involved, and that therefore abuse of discretion is not the applicable standard. He relies upon cases to this effect. In *Tarabochia v. Johnson Line, Inc.*, 73 Wn.2d 751, 440 P.2d 187 (1968), for example, the trial court granted a new trial due to jury experimentation using exhibits taken to the jury room during deliberations, despite the lack of any showing that new material facts were discovered by the jury which must have influenced the jury. *Tarabochia*, at 757. The results of the experiment had not been revealed to the trial court, and there was no basis for concluding that the experiment produced results inconsistent with the testimony given. The trial court believed no showing of discovery of new material facts was required. This court held that the trial court erred in granting the new trial, and, further, that because the order was predicated on a question of law, the issue was reviewable as a matter of law, and not under an abuse of discretion standard.

*Tarabochia* thus involved a case where there was no objective proof that new material was before the jury, in contrast to this case. While the law dictionary did not constitute new evidence as such, the jury nevertheless considered new information during its deliberations which was not admitted as evidence during trial, nor provided it by the court. Under these circumstances, abuse of discretion is

---

[9]*Anderson v. Dobro*, 63 Wn.2d 923, 928, 389 P.2d 885 (1964); *State v. Beel*, 32 Wn. App. 437, 442, 648 P.2d 443 (1982).

[10]*Cf. Worthington v. Caldwell*, 65 Wn.2d 269, 278, 396 P.2d 797 (1964) (motion for new trial).

the appropriate standard of review. Thus, where, in violation of RCW 4.44.300, a bailiff engages in misconduct by communicating matters to a jury which may prejudice the verdict, and the information supplied to the jury can be ascertained without probing the jurors' mental processes, the trial court must grant a new trial if, in its discretion, it has any reasonable doubt that the information prejudicially affected the verdict.[11] Similarly, where a juror supplies the jury with evidence which was not admitted at trial, jury misconduct results.[12] Jury misconduct also results where a juror provides the jury with erroneous statements of law.[13] Where jury misconduct can be demonstrated by objective proof without probing the jurors' mental processes, the effect the improper information may have had upon the jury is a question properly determined in the sound discretion of the trial court.[14] If the trial court has any doubt about whether the misconduct affected the verdict, it is obliged to grant a new trial.[15] In both of these situations, abuse of discretion is the applicable standard of review.

Here, one of the jurors requested a dictionary, the bailiff supplied one, and the jurors considered the definitions of "negligence" and "proximate cause" therein. The bailiff thus engaged in misconduct by providing the jury with out–of–court information in violation of RCW 4.44.300, and jury misconduct resulted from the jury's request for and consideration of matters not admitted at trial nor provided to the jury by the trial court. Whether viewed as misconduct by

---

[11]*See State v. Crowell*, 92 Wn.2d 143, 145–48, 594 P.2d 905 (1979); *O'Brien v. Seattle*, 52 Wn.2d 543, 547–48, 327 P.2d 433 (1958); *State v. Christensen*, 17 Wn. App. 922, 924–26, 567 P.2d 654 (1977).

[12]*Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973).

[13]*See Bouton–Perkins Lumber Co. v. Huston*, 81 Wash. 678, 143 P. 146 (1914).

[14]*Halverson*, at 752.

[15]*Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 198, 668 P.2d 571 (1983); *Halverson*, at 752.

the bailiff, or as misconduct by the jury, the misconduct which occurred could be shown by objective proof without probing the jurors' mental processes; indeed, there is no dispute that the jury looked up the definitions in the dictionary.

The dictionary definition of "negligence" alone could well have affected the verdict. Contrary to Adkins' claim, that definition did not merely restate the definition of "negligence" given in the jury instructions. Among other things, the lengthy dictionary definition includes the statement that negligence "is synonymous with heedlessness, carelessness, thoughtlessness, disregard, inattention, inadvertence, remissness and oversight . . ." Black's Law Dictionary 1231 (3d ed. 1933). Further, the definition refers to criminal negligence, culpable negligence, gross negligence, hazardous negligence, legal negligence, negligence per se, ordinary negligence, slight negligence, wanton negligence and willful negligence, without explanation of when each of these concepts applies. The jury could have been misled by "gross", "ordinary" and "slight" negligence alone. These examples demonstrate that the definition in Black's Law Dictionary contains legal premises not applicable to the facts of this case, and which could well have confused or misled the jury.

Therefore, we hold that abuse of discretion is the proper standard of review and that the trial court did not abuse its discretion in declaring a mistrial as it did. The trial court was justified in concluding that it could not reasonably say that the jury was not influenced by the dictionary.[16]

ISSUE THREE.

CONCLUSION. ALCOA's counsel made an improper "golden rule" argument, which was promptly objected to by

---

[16]Other courts have agreed that a new trial is necessary where the definition of a legal term which the jury looked up was misleading or incorrect. *See, e.g., Dongo v. Banks,* 448 A.2d 885, 888 (Me. 1982); *Wernsing v. General Motors Corp.,* 298 Md. 406, 470 A.2d 802 (1984).

Adkins' counsel, and reversal is required in light of the trial court's failure to give a curative instruction as requested by Adkins' counsel.

■ The biblical "golden rule" states a standard of conduct for individuals: do unto others as you would have them do unto you.[17] Generally, reference by counsel to the "golden rule" per se, or allusions to the rule such as "urging the jurors to place themselves in the position of one of the parties to the litigation, or to grant a party the recovery they would wish themselves if they were in the same position" constitutes an improper "golden rule" argument. J. Stein, *Closing Argument* § 60, at 159 (1985).[18] Such an argument is "improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence."[19]

Courts have found improper "golden rule" arguments where plaintiff's counsel has asked the jurors to place themselves in plaintiff's position,[20] and where the jury has been asked to place itself in a party's shoes with respect to

---

[17]New Testament, Luke 6:31.

[18]*Accord, e.g., Rojas v. Richardson*, 703 F.2d 186, 191 (5th Cir. 1983); *Fountain v. Phillips*, 439 So. 2d 59, 63 (Ala. 1983); *Beaumaster v. Crandall*, 576 P.2d 988, 994 (Alaska 1978); *Delaware Olds, Inc. v. Dixon*, 367 A.2d 178, 179 (Del. 1976); *Millen v. Miller*, 224 Pa. Super. 569, 308 A.2d 115, 117–18 (1973); *World Wide Tire Co. v. Brown*, 644 S.W.2d 144, 145–46 (Tex. Ct. App. 1982); *see generally* Annot., *Prejudicial Effect of Counsel's Argument, in Civil Case, Urging Jurors To Place Themselves in the Position of Litigant or To Allow Such Recovery as They Would Wish if in the Same Position*, 70 A.L.R.2d 935 (1960).

[19]*Rojas*, at 191. *See, e.g., Seaboard Coastline R.R. v. Addison*, 481 So. 2d 3, 6 (Fla. Dist. Ct. App. 1985) (citing *Tyus v. Apalachicola N.R.R.*, 130 So. 2d 580 (Fla. 1961)), *disapproved on other grounds*, 502 So. 2d 1241 (Fla. 1987); *Estis Trucking Co. v. Hammond*, 387 So. 2d 768, 774 (Ala. 1980); *Beaumaster*, at 995; *Delaware Olds*, at 179; *see* J. Stein, *Closing Argument* § 60, at 160 (1985).

[20]*See, e.g., Seaboard*, at 6; *Allen v. Mobile Interstate Piledrivers*, 475 So. 2d 530, 537 (Ala. 1985).

damages.[21] Courts have similarly recognized that an improper "golden rule" argument can be attributable to defense counsel as well.[22]

We conclude that whether made by plaintiff's counsel or defendant's counsel, an argument in a civil case is improper which appeals to the jurors to place themselves in the position of a litigant and to decide the case based upon what they would then want under the circumstances. Where an argument is designed to affect the outcome of the case, either upon the question of liability or damages, a plaintiff's potential recovery or a defendant's potential success in defending is involved. Whether a plaintiff recovers at all, and the amount of a plaintiff's recovery, if any, or whether a defendant prevails, are questions the jury must resolve solely on the evidence and the law, and not on the basis of appeals to sympathy, passion or prejudice.

The statements at issue in this case were made by defense counsel during final argument:

> Any percentage of fault returned against Alcoa—any percentage at all—entitles plaintiff to some verdict. We think it is only fair that no percentage be returned against ALCOA. To base any verdict against us on our corporate status, on sympathy, or even on compromise, would violate your pledge when taking this assignment, and be an unfair verdict.
>
> I've got to give you one more argument about this. I've questioned whether I should even say it. But one overriding fact that has concerned me throughout this case is ALCOA: the fact that it is a large corporation. Can a corporation get a fair trial? And you have all told me that they can, and *that you will treat them as if you were the landowner, and that this was a roofer going on*

---

[21]*See, e.g., Seaboard,* at 6; *Duerden v. PBR Offshore Marine Corp.,* 471 So. 2d 1111, 1115 (La. Ct. App.), *cert. denied,* 476 So. 2d 355 (La. 1985); *Burrage v. Harrell,* 537 F.2d 837, 839 (5th Cir. 1976).

[22]*See, e.g., Beaumaster v. Crandall,* 576 P.2d 988, 994–95 (Alaska 1978); *Brummitt v. Chaney,* 18 Mich. App. 59, 66, 170 N.W.2d 481, 485 (1969); *Miku v. Olmen,* 193 So. 2d 17 (Fla. Dist. Ct. App. 1966), *cert. denied,* 201 So. 2d 232 (Fla. 1967); *Millen,* 308 A.2d at 117.

*your roof, and doing a job,* whether it be a roofer or a plumber, or other special skilled contractor, who should know what he's doing.

*If it was your roof, and if this was your attic vent and fan, you would not expect to be liable for injury to a roofer that you hired, who was injured in doing something he should know better not to do.* We ask only that you give ALCOA that same consideration.

(Italics ours.)

ALCOA argues that this argument simply urged the jury to treat ALCOA as it would any other defendant, despite its status as a corporation. The first part of this argument, that the jury should treat ALCOA as it would any other defendant, is not improper argument.[23] We agree with Adkins, however, that the closing portion of the argument, italicized above, was an appeal to the jurors to place themselves in ALCOA's position and decide the case based on what they themselves would then want under the circumstances. Such argument was an improper "golden rule" argument. Indeed, defense counsel considered not giving the argument, but gave it anyway. Counsel knew that at the very least the argument was questionable. Further, counsel made the improper statements at the very end of his closing argument, just before a recess, thus taking advantage of the "last heard longest remembered" principle.

Having determined that defense counsel made an improper "golden rule" argument, we turn to the next question which is whether reversal is required. In so doing, we agree with the majority of courts which hold that where a golden rule argument has been made, reversal is not automatic.[24]

---

[23]*See* WPI 1.07; *Shanks v. Oregon–Washington R.R. & Nav. Co.,* 98 Wash. 509, 511, 167 P. 1074 (1917).

[24]*See, e.g., CBM of Cent. Ark. v. Bemel,* 274 Ark. 223, 623 S.W.2d 518 (1981); *Anderson v. Harry's Army Surplus, Inc.,* 117 Mich. App. 601, 324 N.W.2d 96 (1982); *Fountain v. Phillips,* 439 So. 2d 59 (Ala. 1983); *Beaumaster,* at 995 (dicta; case reversed on other grounds). *See generally* Annot., 70 A.L.R.2d at 935. Thus, reversal has not been afforded in view of the circumstances presented, for example, where opposing counsel failed to object and seek a curative instruction, where

We begin with the general premise that reversal is required only where the error was prejudicial.[25] Error is prejudicial if it affects, or presumptively affects, the outcome of the trial.[26] The effect of a "golden rule" argument on the jury is difficult to ascertain. It is the nature of the argument itself which establishes its impropriety: the jury is invited to decide the outcome of the case based on sympathy, prejudice or bias, rather than on the evidence and the law.

In most cases, however, including this one, the prejudicial effect of such an argument can be removed by the trial court sustaining a proper and timely objection and then promptly instructing the jury to disregard the improper argument.[27]

Here, Adkins' counsel immediately objected to the improper argument and requested a curative instruction. The trial court could easily have given such an instruction. Instead, however, the court overruled the objection and refused to give such an instruction. The court offered to allow Adkins' counsel to tell the jurors to put themselves in Adkins' position which, had the offer been taken up, would only have served to exacerbate the problem.[28]

---

the trial court sufficiently instructed the jury to disregard the improper argument, where counsel withdrew the argument, where the argument was a justifiable response to opposing counsel's remarks, where the verdict was not excessive, and where the appellate court concluded from the record as a whole that any prejudicial effect was insufficient to require reversal. *See* J. Stein § 60, at 161 and cited cases; 70 A.L.R.2d at 937.

[25]*Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983).

[26]*Brown*, at 196.

[27]*Accord, e.g., Delaware Olds*, at 179; *Millen*, 308 A.2d at 118; *World Wide Tire*, at 146; *Kahn v. Green*, 234 S.W.2d 131, 133 (Tex. Civ. App. 1950).

[28]At a hearing on the motion for a new trial, and after the trial court had been presented with briefs on the subject, the trial court conceded that it had been wrong in this regard:

The jury returned a defense verdict at the liability phase of this second trial, as contrasted with a verdict finding ALCOA 80 percent negligent returned by the jury at the liability phase of the first trial. Because the inconsistency in the verdicts may well have been due to the improper argument in this case, and because the trial court failed to sustain Adkins' objection and give a prompt curative instruction, we conclude that the improper argument presumptively affected the outcome of the trial and requires reversal.

Since our disposition of this issue requires a new trial, we will also address those additional issues raised by Adkins which are likely to recur upon retrial.

ISSUE FOUR.

CONCLUSION. The trial court did not error in ruling that certain WISHA regulations concerning machine guarding do not apply because the fan did not present a hazard to workers in their normal work area. The trial court also did not err when it ruled that certain WISHA regulations regarding warning signs do not apply because the regulations do not require the posting of signs.

Adkins maintains that the trial court erred by ruling that the WISHA regulations concerning machine guarding and warning signs do not apply. He argues that the regulations do apply, and that ALCOA's failure to comply with them constituted negligence per se.

We emphasize that our discussion in this case regarding the WISHA regulations is within the framework of the negligence per se doctrine, whereas, in most cases today, a breach of a duty imposed by an administrative regulation no longer constitutes negligence per se, but instead may be

---

"The second thing that's irrelevant here, is my giving the plaintiffs the right to rebut. As [plaintiff's counsel] argues, if the defense argument was improper as a manifestation of the golden rule argument, telling plaintiffs to do the same thing is not an appropriate remedy. Plaintiffs, after a defense error, if there was one, have the right to object and have me correct the error; or to not object and then treat the door as having been opened."

considered by the trier of fact only as evidence of negligence. *See* RCW 5.40.050 (applicable to actions filed on or after August 1, 1986). Because this action was filed before August 1, 1986, however, the negligence per se doctrine allows a court under certain conditions to substitute a standard of conduct established by an applicable safety regulation promulgated pursuant to state statute.[29]

The machine guarding regulations in question are as follows:

> Machinery and machine guarding—General requirements for all machines—Scope and application. All sections of this chapter which include WAC 296–24–150 in the section number apply to machinery and machine guarding.

WAC 296–24–150.

> Machine guarding. (1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two–hand tripping devices, electronic safety devices, etc.
>
> (2) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.
>
> (3) Point of operation guarding. (a) Point of operation is the area on a machine where work is actually performed upon the material being processed.
>
> (b) The point of operation of machines whose operation exposes an employee to injury, shall be guarded.
> . . .
>
> . . .
> (4) Barrels, containers, and drums. Revolving drums, barrels, and containers shall be guarded . . .
>
> (5) Exposure of blades. When the periphery of the

---

[29]*Bayne v. Todd Shipyards Corp.*, 88 Wn.2d 917, 568 P.2d 771 (1977); *see also* WPI 60.01.

blades of a fan is less than seven feet above the floor or working level, the blades shall be guarded. The guard shall have openings no larger than one–half inch. Safeguards shall be so constructed that rods, pipes, or like material being handled by workmen will not enter same, and come in contact with moving machinery.

(6) Cams and other machine parts which move in such a manner as to create shearing or crushing hazards shall, if exposed to contact, be guarded with a standard safeguard.

WAC 296–24–15001.

Under the rules allowing an applicable safety regulation to establish the appropriate standard of conduct, the court must determine whether the underlying purpose of the regulation pertains to the conduct at issue before adopting a more stringent standard of conduct through application of the negligence per se doctrine than would otherwise apply.[30] If the court finds the underlying purpose violated, then it must decide, as a matter of policy, whether it will apply the regulatory standard to the case.[31] In both of these inquiries, Restatement (Second) of Torts § 286 (1965) provides helpful guidelines:[32]

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

---

[30]*Mina v. Boise Cascade Corp.*, 104 Wn.2d 696, 704, 710 P.2d 184 (1985).

[31]*Mina*, at 704.

[32]*Mina*, at 704; *see also Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 669–70, 709 P.2d 774 (1985).

In deciding whether negligence per se principles apply here, we begin with an examination of the regulations. In general, when construing a statute the court must ascertain and give effect to the intent of the Legislature.[33] The stated purpose of WISHA is "to assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington".[34] As a remedial statute, WISHA will be liberally construed to carry out this purpose.[35] As regulations promulgated pursuant to WISHA,[36] the machine guarding regulations must also be construed in light of WISHA's stated purpose.[37]

In accord with that purpose, WAC 296–24–15001 as a whole contemplates protection to workers from dangers associated with hazards in their work areas. WAC 296–24–15001(1) requires machine guarding to protect any machine operator or other employee in the machine area from hazards. By requiring fans less than 7 feet above the floor or working level to be guarded, WAC 296–24–15001(5) clearly contemplates protection to workers who could be injured by unguarded fan blades at the normal level and range of the workplace. Similarly, WAC 296–24–15001(6) requires guarding where hazards exist which could cause injury in the workplace—cams and any other machine parts must be "exposed to contact" before guarding is required.

■ Thus, before WAC 296–24–15001 can apply to establish a standard of conduct under the negligence per se doctrine, a worker must be exposed to a hazard in his or

---

[33]*Addleman v. Board of Prison Terms & Paroles,* 107 Wn.2d 503, 509, 730 P.2d 1327 (1986); *Hartman v. State Game Comm'n,* 85 Wn.2d 176, 179, 532 P.2d 614 (1975).

[34]RCW 49.17.010.

[35]*Goucher,* at 673.

[36]*See* RCW 49.17.040; RCW 49.17.050 (setting forth authority).

[37]*See Hartman,* at 179.

her work area, regardless of whether that worker is a permanent employee or a worker whose job is of short duration, such as Mr. Adkins. In deciding what constitutes the exposure to a hazard which will trigger application of the regulations, we will consider decisions construing the federal counterpart to WISHA, OSHA, and federal decisions involving machine guarding regulations.[38] Decisions by the Occupational Safety and Health Review Commission (the Commission) demonstrate that to establish a violation of a machine guarding regulation there must be sufficient evidence showing that employees had access to the violative conditions. To establish employee access, the Secretary of Labor must demonstrate a *reasonable predictability* that, in the course of their duties, employees will be, are, or have been in the zone of danger.[39] Where the danger is created by an unguarded machine, the Secretary of Labor can satisfy this burden of proof by demonstrating that the unguarded machine was located where employees could gain access to it and use it in the course of their normal duties.[40]

The Commission's "reasonably predictable" analysis is helpful in this case to deciding whether the machine guarding standards should be applied to establish a standard of conduct under the negligence per se doctrine.

Here, the fan was down inside an air vent, well away from any normal workplace and covered by a weather cap.

---

[38]*See Clarke v. Shoreline Sch. Dist. 412,* 106 Wn.2d 102, 118, 720 P.2d 793 (1986).

[39]*Pennsylvania Steel Foundry & Mach. Co.,* 12 O.S.H. Cas. 2017, 2030 (1986); *Clement Food Co.,* 11 O.S.H. Cas. 2120, 2123 (1984). *See also Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 27 A.L.R. Fed. 925 (4th Cir. 1974) (question what constitutes exposure is for Commission to decide). *But see Brennan v. OSH Rev. Comm'n & Underhill,* 513 F.2d 1032, 1039 (2d Cir. 1975); *Daniel Int'l Corp. v. Donovan,* 705 F.2d 382, 387–88 (10th Cir. 1983). *See generally* M. Rothstein, *Occupational Safety and Health Law* § 73 (1978).

[40]*Pennsylvania Steel,* at 2030–31 (citing *Bechtel Power Co.,* 7 O.S.H. Cas. 1361, 1366 (1979) and *Marinas of the Future, Inc.,* 6 O.S.H. Cas. 1120, 1122–23 (1977)).

While Mr. Adkins argued at trial that it was reasonably foreseeable that he would be exposed to the fan in his roofing work because it is generally known that roofers use heat vents to warm caulk and because a roofer who damaged the vent would be obliged to repair it, both of these propositions were contested at trial. We are unconvinced that it was reasonably predictable that Mr. Adkins would gain access to the fan in the course of his normal duties as a roofer. Indeed, the fan became a hazard only when he consciously and deliberately removed the cap and entered the vent, an area arguably beyond a roofer's normal work area. We conclude, therefore, that the evidence does not establish that Mr. Adkins was within the class of persons WAC 296–24–15001 was designed to protect, that is, a worker within the normal work area. Moreover, we cannot say that the danger presented by the fan was a hazard which the regulations were designed to protect against, that is, a hazard to which an employee would be reasonably predicted to gain access in the normal course of roofing duties. Therefore, we conclude that the trial court did not err when it determined that the machine guarding regulations did not apply as a matter of law.

By permitting testimony on the advisory ANSI codes on machine guarding, the trial court did allow Mr. Adkins to argue his theory that ALCOA was negligent for failing to install some type of guarding device.

The pertinent sign regulations follow:

Specifications for accident prevention signs and tags. WAC 296–24–140.

Scope. (1) These specifications apply to the design, application, and use of signs or symbols (as included in WAC 296–24–14005 through 296–24–14009) intended to indicate and, insofar as possible, to define specific hazards of a nature such that failure to designate them may lead to accidental injury to workers. These specifications are intended to cover all safety signs except those designed for streets, highways, railroads, and marine regulations. These specifications do not apply to plant bulletin boards or to safety posters.

WAC 296–24–14001 (part).

Classification of signs according to use. (1) Danger signs.

(a) Danger signs should be used only where an immediate hazard exists. There shall be no variation in the type of design or signs posted to warn of specific dangers and radiation hazards.

(b) All employees shall be instructed that danger signs indicate immediate danger and that special precautions are necessary.

(2) Caution signs.

(a) Caution signs shall be used only to warn against potential hazards or to caution against unsafe practices.

(b) All employees shall be instructed that caution signs indicate a possible hazard against which proper precaution should be taken.

(3) Safety instruction signs. Safety instruction signs shall be used where there is a need for general instructions and suggestions relative to safety measures.

WAC 296–24–14005.

Taken as a whole, the regulations pertaining to warning signs simply provide the applicable specifications once a duty to post a sign exists. WAC 296–24–14007 sets forth sign designs and colors for danger signs, caution signs and safety instruction signs, and WAC 296–24–14009 lists appropriate wordings for these signs. WAC 296–24–14005 tells which sign, and therefore which particular specifications found in the successive regulations, is to be used if a sign is required. Because WAC 296–24–14005 does not require the posting of signs, as such, the trial court did not err when it refused to rule that these regulations apply as a matter of law.

Once again, as in the case of the machine guarding regulations, the trial court did permit Mr. Adkins to argue his theory that ALCOA was negligent for failing to post warning signs.

Issue Five.

Conclusion. Because there was conflicting evidence regarding the scope of ALCOA's invitation to Mr. Adkins, the trial court properly submitted to the jury the question

of his status as invitee or trespasser at the time he put his hand into the vent.

The parties do not dispute that under the common law ALCOA's invitation to Mr. Adkins was initially as a business invitee.[41] He asks, however, that we abolish the common law distinction between duties owed to invitees, licensees and trespassers. We recently declined to do this in our decision in *Younce v. Ferguson,* 106 Wn.2d 658, 724 P.2d 991 (1986); we adhere to that decision.

Mr. Adkins argues that the trial court should have determined as a matter of law that he was not a trespasser when he put his hand inside the vent. He reasons that he was within the scope of his employment at the time the accident occurred, and therefore he could not have been a trespasser. The relevant inquiry is whether he exceeded the scope of ALCOA's invitation to him as a business invitee. Testimony at trial demonstrated that the parties disputed whether the scope of ALCOA's invitation to Mr. Adkins, that is, whether the scope of the contract between Wagner Roofing and ALCOA, included, in the absence of further express approval by ALCOA, any repairs to the vent itself should a roofer damage it. The parties further disputed whether it was foreseeable to ALCOA, or whether ALCOA had notice, that roofers would use this type of exhaust vent to warm tubes of caulk. In light of the conflicting testimony, the trial court did not err when it submitted the question of Mr. Adkins' status to the jury.[42]

Mr. Adkins further contends in this connection that the trial court erred by failing to instruct the jury that ALCOA's invitation included the vent unless it clearly limited the area within the scope of its invitation. We would

---

[41]*See* Restatement (Second) of Torts § 332 (1965) (business invitee is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land).

[42]*See Mesa v. Spokane World Exposition,* 18 Wn. App. 609, 613, 570 P.2d 157 (1977) (scope of invitation is question of fact), *review denied,* 90 Wn.2d 1001 (1978).

ordinarily decline to address this issue because at trial counsel for Mr. Adkins did not except on this basis to the only instruction to which he has assigned error here, instruction 8.[43] Moreover, he has failed to include in his brief any jury instruction he proposed on this question.[44] We recognize, however, that Mr. Adkins may request such an instruction on retrial. While we cannot foresee what the precise nature of such a requested instruction might be, and therefore any discussion about the propriety of it would be premature, we observe that Mr. Adkins' reliance upon *Mesa v. Spokane World Exposition,* 18 Wn. App. 609, 570 P.2d 157 (1977), *review denied,* 90 Wn.2d 1001 (1978) is misplaced. *Mesa* involved a general and ambiguous express invitation to the general public. Here, ALCOA's invitation to Mr. Adkins as a business invitee was defined by the scope of its work contract with Wagner Roofing, and the scope of that invitation was properly a jury question. Further, this court has declined to construe *Mesa* as standing for the proposition that "failure to exclude plaintiff from an area intended to be private could, in and of itself, constitute a breach of the duty of reasonable care." *Egede–Nissen v. Crystal Mt., Inc.,* 93 Wn.2d 127, 133 n.6, 606 P.2d 1214 (1980). *Mesa* does not set forth a trial court's obligation to give the kind of "bright line" instruction for which Mr. Adkins argues.

Two additional issues raised by Adkins need not be addressed. First, he maintains that the trial court erred by permitting the jury to view the roof, vent duct and fan. We will not speculate as to whether a jury view will be permitted upon retrial, nor as to the nature and proceeding of such a view should it occur. Finally, Mr. Adkins maintains

---

[43]*See* CR 51(f); *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 75, 684 P.2d 692 (1984); *American Oil Co. v. Columbia Oil Co.,* 88 Wn.2d 835, 842, 567 P.2d 637 (1977); *Stuart v. Consolidated Foods Corp.,* 6 Wn. App. 841, 846, 496 P.2d 527 (1972).

[44]*See* RAP 10.4(c); *Thomas v. French,* 99 Wn.2d 95, 99–101, 659 P.2d 1097 (1983).

that the trial judge's attendance at the ALCOA WAPAC dinner during the course of the trial created an appearance of unfairness requiring that the judge sua sponte declare a mistrial. Aside from the fact that Adkins failed to move for a mistrial on this issue when invited by the court to do so, and therefore waived any error, we decline to reach this issue because it is highly unlikely that it would arise again.

ISSUE SIX.

CONCLUSION. RCW 49.17.060(1) does not impose a general duty on an employer to provide a safe workplace to an employee of an independent contractor whom the employer has hired.

ALCOA argues that the trial court erred by ruling that under RCW 49.17.060 ALCOA owed Mr. Adkins a nondelegable general duty to provide him a safe place to work. ALCOA raises this issue pursuant to RAP 2.4(a), maintaining that it is an issue which, if repeated upon remand, would constitute prejudicial error. We agree.

RCW 49.17.060 provides in relevant part:

Each employer:
(1) Shall furnish to each of his employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his employees: . . .; and
(2) Shall comply with the rules, regulations, and orders promulgated under this chapter.

ALCOA maintains that RCW 49.17.060(1) applies only to its own employees, and not to the employees of an independent contractor with which it has contracted. ALCOA further maintains that RCW 49.17.060(2) is relevant only where there is a claim that an employer has violated a specific rule, regulation, or order. Because, ALCOA further argues, the trial court correctly held that the machine guarding and warning sign regulations do not apply, there are no specific rules, regulations or orders at issue which would support invocation of RCW 49.17.060(2).

We recently addressed applicability of the two provisions in RCW 49.17.060 and noted that under it, an employer has

a twofold duty.[45] First is a "general duty" to protect its employees from hazards likely to cause death or serious bodily injury.[46] Second is a "specific duty" imposed on employers to comply with WISHA regulations. When a party relies upon the general duty clause, only those who are employees of the particular employer are protected. While earlier Washington case law had supported a holding that an employer owed a general duty to *all workmen* on its premises, that case law resulted from language in former RCW 49.16.030, which was repealed and replaced by Laws of 1973, ch. 80, codified in RCW 49.17.[47] RCW 49.17.060(1) now speaks in terms of an employer owing a duty to each of "*his* employees". (Italics ours.)

*Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 709 P.2d 774 (1985) is controlling: RCW 49.17.060(1) does not impose a general duty on an employer to provide a safe workplace to an employee of an independent contractor whom the employer has hired.[48] Therefore, the trial court erred in holding that RCW 49.17.060(1) is applicable. On retrial, the trial court should not apply this provision nor instruct the jury according to its terms.

The specific duty clause in RCW 49.17.060(2), in contrast to RCW 49.17.060(1), applies when a party asserts that the employer failed to comply with a particular WISHA standard or regulations. In such a case, all employees who work on the premises of another employer are members of the protected class.[49] RCW 49.17.060(2) was not involved at trial in light of the trial court's ruling that the WISHA

---

[45]*Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 709 P.2d 774 (1985).

[46]*Goucher*, at 671.

[47]*Goucher*, at 671.

[48]*Accord, Bozung v. Condominium Builders, Inc.*, 42 Wn. App. 442, 711 P.2d 1090 (1985).

[49]*Goucher*, at 672–73 (citing *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799 (6th Cir. 1984) (construing OSHA)).

machine guarding and warning sign regulations did not apply. Because we have affirmed the holding that these regulations do not apply, it again follows that the trial court should not instruct in terms of RCW 49.17.060(2).[50]

Mr. Adkins maintains that ALCOA owed him a common law general duty to provide him a safe workplace. The general rule at common law, however, is that one who engages an independent contractor is not liable for injuries to employees of the independent contractor resulting from the contractor's work.[51] Mr. Adkins has not argued nor provided relevant authority suggesting that any exception to this general rule applies in this case. Accordingly, we decline to address the issue.

Reversed and remanded for a new trial.

PEARSON, C.J., UTTER, DOLLIVER, CALLOW, GOODLOE, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (dissenting)—I would have reinstated the plaintiff's verdict on liability at the first trial. There was no basis for the trial court to set aside the jury's verdict by granting a motion for a mistrial because one of the jurors had asked for a dictionary. There is not an iota of evidence that the presence of a dictionary in the deliberating room affected any juror or any juror's decision. At most, the presence of the dictionary was harmless error. I dissent.

## MISTRIAL

The granting of a motion for a mistrial should be overturned only for abuse of discretion, and a much stronger showing of an abuse of discretion will be required to set aside an order granting a new trial than one denying it. *Alger v. Mukilteo*, 107 Wn.2d 541, 551, 730 P.2d 1333 (1987). Nevertheless, courts have an equally strong interest in upholding jury verdicts. *Alger*, at 551. The trial court is

---

[50] *See Goucher v. J.R. Simplot Co., supra.*

[51] *Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 635 P.2d 426 (1981).

required to justify its grant of a mistrial by giving definite reasons of law and facts for its order granting a mistrial. CR 59(f).

Here, the trial court, in violation of CR 59(f), never issued any written order stating its reasons for granting ALCOA's motion for a mistrial. The court, however, set forth its reasons for granting a mistrial in the record of the proceedings. That record shows that the court misconstrued its duty, and felt it necessary to grant the mistrial despite the lack of any colorable showing that the jury's skimming the definition of "negligence" in Black's Law Dictionary could have had any prejudicial effect on its deliberations. The trial judge stated in his oral ruling granting the motion for mistrial:

> I'm going to grant the motion for mistrial. The problem that I have is with the numerous forms of negligence that are listed in the dictionary. At least some of them looked at all of those, and I can't say for sure what influence that may have had on their thought process.
>
> [Juror] Mr. Lazanski read them, and clearly, it could have had an influence on his thought process. The others, at least, were made aware of the numerous definitions in the book. As Mr. Lazanski put it: "of the numerous ways to be negligent." And I just—that's the factor that I think makes it so that we cannot conclude that there was no prejudice.
>
> If they had just read the definition of negligence that was read out loud by Mrs. Sheets, and if they had just read the definition of "proximate cause" that was read out loud by Mr. Lazanski, maybe we wouldn't have prejudice, because those things are basically in line with the instructions that I'd already given them. However, the additional material that they did look at, as well as the access to the whole book, seems to me that I can't reasonably say that there was no influence.
>
> . . .
>
> I cannot find that this breach of duty by my staff was not prejudicial. It may well have been prejudicial. It may have operated in their thought process. And for that reason, I can't let the matter go forward on the present basis.

Report of Proceedings vol. IV, at 319–21 (first trial). Absent in the court's ruling is any discussion of how the definitions of numerous forms of negligence, not relevant to this case, might have been prejudicial.

It is crucial to consider what the jury read in the dictionary before jumping to the conclusion that it was prejudicial. The definition of "negligence" in Black's Law Dictionary 1229 (3d ed. 1933) states in part:

> Negligence. The omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do. . . .

(Citations omitted.) That portion of the definition correctly states the law, and is admittedly substantially the same as the jury instruction in this case. The dictionary then, in nearly three columns of print, lists approximately 90 citations to common law authorities, giving succinct summaries of their definitions of negligence, such as "[t]he failure to use ordinary care" or "[t]he breach of a legal duty". Those authorities do not contain erroneous statements of the law, but rather further support and expand on the main definition of negligence. Finally, the definition gives separate definitions for "collateral negligence", "contributory negligence", "mutual contributory negligence", "concurrent contributory negligence", "concurrent negligence", "criminal negligence", "culpable negligence", "gross negligence", "hazardous negligence", "legal negligence", "negligence per se", "ordinary negligence", "slight negligence", "wanton negligence", and "willful negligence". The definitions of types of negligence are not alleged to contain erroneous statements of the law; however, they are obviously not all relevant to the instant case.

In considering whether evidence improperly presented to the jury requires a mistrial, we do not allow the jury to *impeach its own* verdict by testimony on the actual effect of such material on its deliberations. Rather, we consider only what the jury saw, and the likelihood of its prejudicial

effect. *O'Brien v. Seattle*, 52 Wn.2d 543, 547, 327 P.2d 433 (1958). Thus, although the jurors did no more than glance at the definitions of the various kinds of negligence "in awe of the fact that there were all kinds of forms of negligence" and then returned to the court's actual instruction, Report of Proceedings vol. IV, at 283 (first trial), we must consider the issue as though the jury read and considered the definitions in full.

Even resolving every doubt in favor of ALCOA, it is impossible to conceive of any way that scrutiny of the dictionary definitions of the various types of negligence might prejudice the jury's verdict. We must presume that the jury did not ignore the court's instructions and find ALCOA liable on the lesser standard for "slight negligence" when it was instructed under the "negligence" standard. *In re Metropolitan Seattle*, 67 Wn.2d 923, 930–31, 410 P.2d 790 (1966); *In re Estate of Cory*, 169 N.W.2d 837 (Iowa 1969) (presumption that jury followed the court's instructions despite looking up definition of "undue influence" that differed from such instructions in dictionary provided by foreman). To reject completely the jury's decision, reached after hours of deliberation after hearing days of testimony, on such a remote possibility is to show a troubling disrespect for the ability of the jury to fulfill its obligations. To put it bluntly, if we believe that a jury would impose a different burden on a party merely because it saw a definition applicable to a different standard, then we must believe that the jury is wayward and unintelligent. Such a belief casts our entire system of justice into doubt.

The Supreme Court of Wyoming gave due consideration to the jury's intelligence in the factually similar case of *Zanetti Bus Lines, Inc. v. Logan*, 400 P.2d 482 (Wyo. 1965). There the bailiff gave the jury an ordinary dictionary, which it used to look up the term "natural". The *Logan* court noted that the dictionary contained eight meanings of "natural", of which only one could reasonably be applied to the case at issue, and that definition did not wrongly state the law. The court held sufficient respect for

the jury to conclude that it would not have confused itself by attempting to use clearly inapplicable definitions. I too have sufficient respect for our Washington juries to believe that they will not strain themselves to use clearly inapplicable definitions to throw themselves into the state of confusion suggested by the trial court and the majority.

The authorities unanimously hold that the jury's improper access to definitions or instructions will not result in a mistrial unless they are of such a character as to cause prejudice.

> A verdict will generally not be set aside because a paper, which should not be with the jury during their deliberation, has been sent to the jury room through inadvertence or accident, and not through the connivance or design of the prevailing party, unless it appears the paper was of such a character as to prejudice the unsuccessful party or that other circumstances render its reading harmful.

*Snyder v. Sotta*, 3 Wn. App. 190, 192, 473 P.2d 213 (1970). In *Snyder*, the jury was accidentally provided with the plaintiff's proposed jury instructions. The Court of Appeals rejected the trial court's belief that erosion of the normal deliberative process must be presumed when any substantial or foreign matter related to issues before the jury is obtained and perused by it, and stated: "The content of the document must be examined by the court in determining any possible prejudicial effect." *Snyder*, at 193. The mere possibility of prejudice without further inquiry is insufficient to order a new trial. *Spratt v. Davidson*, 1 Wn. App. 523, 526, 463 P.2d 179 (1969).

Here, the trial court mistakenly believed that the extra definitions of negligence provided by Black's Law Dictionary might disrupt the jury's deliberations without demonstrating any consideration of what prejudicial effect there might have been. We rejected such an extreme reaction to the discovery of impermissible acts in the jury room in *Tarabochia v. Johnson Line, Inc.*, 73 Wn.2d 751, 440 P.2d

187 (1968). In *Tarabochia,* the trial court, upon discovering that the jury had impermissibly conducted its own experiment on the evidence, granted a mistrial without inquiring as to the result of the experiment. This court reversed because there was no showing that the experiment introduced new evidence that might have influenced the verdict. Similarly, here the trial court granted the mistrial without inquiring what the jury might have culled from the dictionary that would have prejudiced it. It made the same error as the trial court in *Tarabochia*: it was so concerned with the bailiff's having provided impermissible material that it granted a mistrial without examining whether that material contained anything prejudicial. In doing so it did a dishonor to the jury and great damage to Adkins. I would reverse the grant of a mistrial, reinstate the jury's original verdict on liability and remand for trial on damages.

As the majority has reversed the defense verdict in the second trial and granted a new trial, I would like to take issue with it on its suggestion as to how the trial judge should rule on unresolved issues in the subsequent third trial.

## WISHA REGULATIONS

The most damaging aspect of the majority's decision is its affirmation of the trial court's denial to Adkins of the benefit of WISHA regulations that would have protected him from the injury he suffered. The majority correctly notes that the purpose of WISHA is "to assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington . . ." RCW 49.17.010. The majority then interprets WISHA in such a narrow way as to totally deny its benefit to temporary workers such as Adkins. Because Adkins is a worker in the state of Washington, the WISHA regulations clearly apply to the negligence issue in this case under the guidelines of Restatement (Second) of Torts § 286 (1965). The sole legitimate issue remaining is whether

ALCOA in fact complied with applicable WISHA requirements. The testimony indicates it failed to do so. *See* WAC 296-24-15001.

The majority, however, engages in a complex analysis under which it leapfrogs to a conclusion that WISHA does not apply to Adkins at all. The majority states that an employee is entitled to the protection of WISHA regulations only if he or she is exposed to a hazard in his or her normal work area. The majority then introduces the concepts that the exposure to the hazard must be reasonably predictable and in the course of normal duties. Majority, at 146-47. Thus, workers such as Adkins who travel from place to place to perform repetitive duties are not protected by WISHA under the majority's analysis. Nowhere in the language of WISHA or the regulations at issue is such a limitation to be found. To the contrary, the regulations establish standards without regard to how frequently employees might encounter the relevant hazard. As with interpretations of statutes, when a regulation is unambiguous on its face courts should not look beyond its language. *See Mahoney v. Shinpoch,* 107 Wn.2d 679, 684, 732 P.2d 510 (1987).

The majority's reliance on opinions by the Occupational Safety and Health Review Commission to limit the application of WISHA regulations is ill founded. RCW 49.17.010 states that the purpose of WISHA is "to create, maintain, continue, and enhance the industrial safety and health program of the state, which program shall equal *or exceed* the standards prescribed by the Occupational Safety and Health Act of 1970 [Pub. L. No. 91–596, 84 Stat. 1590]." (Italics mine.) The use of opinions under OSHA to limit the scope of WISHA thus runs directly counter to express legislative intent. Moreover, while we often do consider federal cases interpreting federal counterparts to Washington legislation, no special deference is merited by federal administrative agency decisions. *See Clarke v. Shoreline Sch. Dist. 412,* 106 Wn.2d 102, 118, 720 P.2d 793 (1986); *Fahn v. Cowlitz Cy.,* 93 Wn.2d 368, 376, 610 P.2d 857, 621 P.2d

1293 (1980). This is especially true in this area of the law, where the Occupational Safety and Health Review Commission's attempts to limit the application of OSHA are consistently overruled by federal courts of appeal. *Donovan v. Adams Steel Erection, Inc.,* 766 F.2d 804, 811 (3d Cir. 1985) (finding in error the Commission's limiting OSHA regulations to situations in which employees are actually exposed to hazards); *Brock v. L.R. Willson & Sons, Inc.,* 773 F.2d 1377, 1386 (D.C. Cir. 1985) (rejecting the Commission's excusing employers from safety requirements where exposure to a hazard is of short duration).

The federal courts of appeal use a test of employee "access" to a hazard to determine whether there is an OSHA violation. *Donovan,* 766 F.2d at 811; *Daniel Int'l Corp. v. Donovan,* 705 F.2d 382, 388 (10th Cir. 1983). This test does not depend on "reasonable predictability", majority at 147, but rather on "the slightest possibility of [the hazard's] occurrence . . ." *Usery v. Marquette Cement Mfg. Co.,* 568 F.2d 902, 910 (2d Cir. 1977).

Even if the trial court were correct in holding that WISHA regulations do not apply to every fan blade to which a worker might ever be exposed, it was error to rule as a matter of law that the WISHA regulations do not apply here, and deny Adkins the opportunity to prove otherwise to the jury. The jury may well have disagreed with the court's determination that it was not reasonably predictable for a worker on the roof to be injured by a fan in an unusual position, and therefore have concluded that WISHA applies. It was error for the trial court to determine that issue as a matter of law where substantial evidence supports a contrary conclusion. The majority admits that the necessity of Adkins using the heat vent to warm caulk was contested at trial. Majority, at 148. The majority's statement that the heating vent was not within Adkins' normal work area is thus conclusory; in fact the evidence in the record indicates otherwise. Report of Proceedings vol. II, at 252–57 (testimony of Merle Larson); vol. II, at 316, 356–60 (testimony of Adkins) (second trial). Adkins was

prohibited from arguing his theory of the case with regard to WISHA requirements; only circular reasoning could hold that since he lost his case (in the second trial) it was not error to deny him that right.

### TRESPASS INSTRUCTION

After affirming the trial court's refusal to allow Adkins to argue a theory of the case for which there was substantial evidence, the majority affirms the trial court's prejudicial instructions to the jury on a theory of law for which there was no substantial evidence. To consider it plausible that Adkins was a trespasser in the vent because he was only invited on the roof is an affront to common sense. Adkins was contractually obligated to repair the roof, which included the area around and in the air vent should it require repair or cleanup. Report of Proceedings vol. II, at 358–59 (second trial). The notion that he should not have retrieved a caulking tube because he was not "invited" to do so ignores the realities of his duties. The only reason Adkins should not have reached down with his hand was that doing so might cause him injury; thus the only relevant instructions were those on comparative negligence.

There does not appear to be any reason why the majority's analysis should apply any differently to ALCOA's own employees than to Adkins. Thus, the majority's determination that the facts of this case might indicate trespass implies that employers could always limit their liability for the failure to provide safe working conditions by telling employees that they have no permission to stick their hands into moving machinery. When the requirements of the job combined with the lack of safety precautions result in such an accident, the employer could then call the employee a trespasser with respect to that particular machinery and cloud the issue of its liability. For that reason, the question of Adkins' permission to touch the vent should not be a factor in the jury's mind; rather the only

proper issue was ALCOA's and Adkins' comparative negligence. The court's instruction on trespass was highly prejudicial to Adkins.

CONCLUSION

Because the trial court could not have reasonably believed that the jury's access to dictionary definitions of "negligence" and "probable cause" might be prejudicial, I would reverse its grant of a mistrial, reinstate the liability verdict of the first trial and remand for a determination of damages. The court made numerous errors in the second trial, including failing to allow testimony or instructions on applicable WISHA regulations, and instructing on trespass, each of which will require reversal if such errors are perpetuated at the third trial.

I dissent.

After modification, further reconsideration denied June 9, 1988.